APR 17 2025 AM9:15
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION


GEOFFREY JACOBS,
Plaintiff,

v.                                                              ) Case No. **3:25-cv-00567-SVN**
                                                                )
                                                                )
PAYWARD, INC. and PAYWARD VENTURES, INC and PAYWARD
INTERACTIVE, INC., d/b/a KRAKEN, Defendant.

Defendants.

**THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF ARISING FROM SECURITY NEGLIGENCE, FRAUDULENT
MISREPRESENTATION, AND UNFAIR TRADE PRACTICES BY A
DIGITAL ASSET EXCHANGE**

**TABLE OF CONTENTS**

1.    **Introduction** ………………………………………………………....…5

2.    **Jurisdiction and Venue** …………………………………………….....7

3.    **Invalidity and Unenforceability of Arbitration Clause** …………….8

      A. Lack of Assent Due to Third-Party Use …………………………8

      B. Fraudulent Inducement …………………………………………..9

      C. Procedural and Substantive Unconscionability ……………………10

      D. Public Policy and the Need for Transparency ………………….....11

      E. Breach of Duty and Failure of Notice (Contractual and Statutory) ..14

4.    **Parties** ……………………………………………………....………15

5.    **Factual Allegations** …………………………………………………...**15**

       A. Timeline of Events ……………………………...………………17

       B. Detailed Narrative of the Incident and Aftermath …………………35

6.    **Article III Standing** ………………………………………………..**41**

7.    **Causes of Action** ……………………………………………………..**42**

**Count I** – Negligence ……………………………………………………42

**Count II** – Gross Negligence ……………………………………………46

**Count III** – Common Law Fraud / Misrepresentation …………………………49

**Count IV** – Deceptive Public Representations (Lanham Act & CUTPA) ……55

**Count V** – Violation of the Computer Fraud and Abuse Act (CFAA) ………..61

**8. Harm to Plaintiff** ……………………………………………………..**66**

**10. Prayer for Relief** ……………………………………………………**68**

**12. Signature Block** ……………………………………………………**70**

**13. List of Exhibits (Appendix A)** ……………………………………....**71**

**14. Glossary of Legal and Technical Terms (Appendix B)** ……………......**74**

**List of Exhibits**

| Exhibit Name | Exhibit Description |
|---|---|
| **Exhibit 3** | Screenshot of test of Kraken's public "Sign-in troubleshooting & Account security" web form in the design that had many vulnerabilities. And the email generated from it, received from it on an email account not connected with a Kraken account. |

| | |
|---|---|
| **Exhibit 5** | Bare PDF file- Kraken's Terms of Service, as downloaded by Plaintiff from www.kraken.com on September 20, 2024. Text involving a binding agreement is white, invisible,and unreadable. Attached as bare file to exhibit invisible text. |
| **Exhibit 6** | Kraken's Terms of Service (page 2 and 20 referenced); Page 2 states the terms govern the Kraken subscriber's use of Kraken's website and services, Page 20 specifies arbitration clause timing and limitations. From later date than version of terms of service in Exhibits 5 and 7). |
| **Exhibit 7** | Informational page showing the invisible text from Exhibit 5, screenshot how Plaintiff found it. This is followed by the Terms of Service file downloaded from www.kraken.com |
| **Exhibit 8** | Phishing email received by the Plaintiff when the phishing attack was commenced. |
| **Exhibit 9** | Screenshot of Plaintiff's cell phone call log from May 2, 2024, showing that the scammer called him from the phone number 505-596-1787. |
| **Exhibit 10** | Screenshot of text from scammer instructing Plaintiff to go to a certain web site that looked like Kraken's website. |
| **Exhibit 11** | Screenshot showing that site (referred to in Exhibit 10) that accepted Plaintiff's Kraken credentials. |
| **Exhibit 12** | Evidence of ICP token price on May 2, 2024. |
| **Exhibit 14** | Example of legitimate Kraken confirmation emails previously received by Plaintiff. Email confirmed withdrawal address creation. |
| **Exhibit 15** | Kraken documentation – how to create a withdrawal address. Step 8- "You will receive request to verify the newly added withdrawal address." |
| **Exhibit 16** | Confirmation emails received by Plaintiff for his deletion of fraudulent addresses created by scammer; no corresponding confirmations had been received for creation of these addresses. |
| **Exhibit 19** | Email. Received from Dfinity support, confirming activity on neurons consistent with theft of Plaintiff's Dfinity Internet ID and wallets of his Internet ID. May 7, 2024, 10:46 EDT |
| **Exhibit 20** | Dfinity's response confirming wallet alteration and inability to freeze/reverse. Email from Dfinity support. Confirming that Dfinity cannot recover the ID or assets for Plaintiff.  May 7, 2024, 10:46 EDT |
| **Exhibit 21** | Screenshot of the Kraken ledger upon Plaintiff's withdrawal of the of 15,011 ICP tokens on 4/19/24 |
| **Exhibit 23** | Evidence of ICP sent from Ledger Live to NNS (Dfinity's system). |
| **Exhibit 24** | ICP Dashboard showing Plaintiff's ICP holdings. |

| | |
|---|---|
| **Exhibit 25** | Screenshot of Plaintiff's 2 ICP NNS Neurons (wallets). |
| **Exhibit 26** | Email. Plaintiff's first report of the incident to Kraken. Fri, May 3, 2024 at 12:05 AM |
| **Exhibit 27** | Emails. Plaintiff communicating with Kraken support representative. Asking how he was robbed. Sat, May 11, 2024 at 6:40 PM Kraken support response avoiding direct explanation, focused on account restoration. |
| **Exhibit 28** | Emails. Series of emails to and from Kraken, beginning at Sun, May 19, 2024 at 6:26 PM Follow-up support correspondence with Kraken. |
| **Exhibit 31** | Email exchange with Daniel Clarkson (Kraken Legal), confirming scammer used Kraken's web form "Sign-in troubleshooting & Account security" to manipulate Plaintiff. |
| **Exhibit 32** | Article: Top 5 cybersecurity threats legal teams face today \| Thomson Reuters. |
| **Exhibit 34** | Kraken promotional material claiming 'Industry-leading security'.Kraken promotional material claiming 'Industry-leading security'. "Industry leading security protects your investments". "Protecting your funds and privacy is our number one objective". |
| **Exhibit 35** | Kraken promotional material claiming- "Kraken celebrates excellence in Cybersecurity with a new accreditation" ISO 27001 Certification Announcement. |
| **Exhibit 36** | Kraken promotional material- "What does Kraken do to secure my personal information?" Kraken documentation on user data protection. |
| **Exhibit 37** | Kraken promotional material- "Kraken completes SOC 2, Type 1 for custody and funding services". |
| **Exhibit 39** | Kraken promotional material- "Security above everything: why every month is Cybersecurity Awareness Month at Kraken". |
| **Exhibit 40** | Kraken Documentation- "Bug Bounty Get Bitcoin for finding security bugs". |
| **Exhibit 41** | Kraken documentation on client security management. |
| **Exhibit 43** | Email from Investigator Stempien identifying Kraken's web form "Sign-in troubleshooting & Account security" as enabling phishing and social engineering. |
| **Exhibit 44** | Email sent to Investigator Stempien from Plaintiff entering his email address into web form. Email was forwarded to Plaintiff by Investigator Stempien at a later time. |
| **Exhibit 47** | Kraken- Support "Sign-in troubleshooting & Account security" Modified Kraken web form, much more secure than it was on May 2, 2024. Changes were post phishing attack on May 2, 2024. Fixes were made silently by Kraken. No public announcement. |
| **Exhibit 52** | Kraken Documentation- "How to differentiate a Kraken email from a phishing email" "Emails from Kraken will always have |

4

the @kraken.com domain name at the end of them.".
Kraken claim that emails from support@kraken.com are
inherently secure. Kraken Documentation- "How to differentiate
a Kraken email from a phishing email" "Secure emails from
Kraken include:". Emails from support@kraken.com are

**Exhibit 53**    inherently secure.

Kraken description of phishing emails and how to recognize

**Exhibit 54**    them.  Kraken's own definition of phishing.

Kraken Documentation – Policy documentation confirming that
email confirmations are required for new withdrawal addresses.
"We will notify you anytime the following actions are attempted

**Exhibit 55**    on your account" "Adding or updating withdrawal addresses".

Emails to and from Kraken support and Plaintiff between 5-24-

**Exhibit 59**    24 and 6-6-24.

Email received after Plaintiff learned of Kraken's web for "Sign-
in troubleshooting & Account security" and tested it out himself.

**Exhibit 60**    Email was produced by web form.

**Exhibit 62**    Email Header from email sent by Kraken Support.

**Exhibit 63**    Email Header from Plaintiff Email- Testing Form.

Email header of scammer's phishing email. Email Header from
Scammer Email, generated by the Kraken web form on May 2,

**Exhibit 64**    2024.

Email Plaintiff sent to Kraken's legal team summarizing his
position and offer to settle for just the restoration of the 15,011

**Exhibit 65**    ICP tokens that were lost. Sent on 12-17-24

List of NIST Special Publication 800-177 Revision 1 violations,
a cross reference of their corresponding pages of mention in the
NIST Special Publication 800-177 Revision 1, a summary
explanation of each violation, and the NIST Special Publication

**Exhibit 66**    800-177 Revision 1 document.

List of ISO/IEC 27001 violations, the corresponding Annex or
Clause, relevant section description, the corresponding page
within the ISO/IEC 27001 document, and the ISO/IEC 27001

**Exhibit 67**    document.

List of SOC 2 Type I violations, the corresponding violated
Trusted Service Criteria, description, page citation from "2017
Trust Services Criteria (With Revised Points of Focus – 2022)"
document, and the "2017 Trust Services Criteria (With Revised

**Exhibit 68**    Points of Focus – 2022)" document.

**INTRODUCTION**

1. This is a case about **trust betrayed**—and a platform that claimed to protect but instead exposed. Plaintiff Geoffrey Jacobs entrusted over $200,000 in digital assets to Kraken, a company that marketed itself as an "industry leader" in security. But on May 2, 2024, **a scammer—armed only with a web browser— used Kraken's own website to send a fake support email from Kraken's official email address, impersonate a Kraken employee, and launch a coordinated phishing attack**. The attacker didn't hack Kraken's servers— **he simply used a public form that Kraken built**. A form that required no identity verification, no account link, and no safeguards to prevent abuse. **This is the first known instance where a phishing scam was enabled** *not* **by a hacker—but by the platform itself.**

2. For over two hours, **the attacker—posing as a Kraken support agent— manipulated Plaintiff with urgency, fear, and fabricated authority. The phishing email, complete with a Kraken support ticket, appeared completely legitimate.** The impersonator even knew Plaintiff's private identifying information. By the time the scammer walked away with control of Plaintiff's ICP wallets, 15,011 tokens—worth over $200,000—were gone.

3. **Kraken offered no answers.** Plaintiff and a Stamford Police Department investigator pleaded for an explanation. Kraken refused. **It wasn't until Plaintiff sent printed evidence to Kraken's legal department that Kraken admitted what it had known all along: that the scam was enabled by its own**

6

**infrastructure**. The same public-facing web form that Kraken quietly redesigned shortly after.

4. **This lawsuit seeks more than compensation. It seeks accountability. Kraken misrepresented its security practices, violated foundational cybersecurity standards, failed to disclose dangerous flaws, and refused to assist its own customer after being warned of the threat.** Plaintiff now brings six claims—for negligence, gross negligence, violation of the CFAA, false advertising, common law fraud, and CUTPA violations—supported by Kraken's own documentation, public promises, silent fixes, and an extensive evidentiary record.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction), as Plaintiff is a resident of Connecticut, and Defendants are corporations headquartered in California, and with the amount in controversy exceeding $75,000.

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

7. Venue is proper in this district under 28 U.S.C. § 1391(b) because the Defendant conducts business in this jurisdiction, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

**INVALIDITY AND UNENFORCEABILITY OF ARBITRATION CLAUSE**

**A. Lack of Assent Due to Third-Party Use**

8. Rule Statement: Arbitration clauses bind parties only where mutual assent exists. Consent cannot arise from acts by unauthorized third parties who exploit a service provider's systems.

9. Argument and Facts: **Plaintiff's harm arose from a scammer's misuse—not from Plaintiff's use—of Kraken's support infrastructure, specifically its insecure public "Sign-in troubleshooting & Account security" web form.** The form allowed anonymous individuals to send spoofed emails from support@kraken.com, impersonating Kraken staff, and create phishing vectors. Plaintiff never authorized or used this form prior to being victimized by it.

10. **Kraken's Terms of Service explicitly apply to a user's own use of the site and services (Exhibit 6, p. 2)**. Here, Plaintiff's claims stem from a third party's misuse of Kraken's system, not his own usage. Kraken created the vulnerable vector through which the scammer exceeded access (i.e., infrastructure misuse). **The misuse wasn't initiated through normal usage, but via a form Kraken offered to non-logged-in users. Users who were completely anonymous. Thus, no assent to arbitration exists for this dispute.** The arbitration clause cannot bind Plaintiff to disputes initiated through third-party fraud enabled by Defendant's own systems. See Exhibits 3, 8, 31, 43, 44, 60.

**Supporting Authority:**

8

- 11. Specht v. Netscape, 306 F.3d 17 (2d Cir. 2002)

- 12. Nguyen v. Barnes & Noble, 763 F.3d 1171 (9th Cir. 2014)

**B. Fraudulent Inducement**

13. Rule Statement:  **An arbitration agreement is unenforceable if a party was fraudulently induced into accepting it through material misrepresentations**. This includes false claims about the safety or reliability of a service used to secure consent, as well as **materially false statements about platform security or protections. As well as hidden text in the terms of service file which was downloaded from www.kraken.com (Exhibit 7)(Exhibit 5)**.

14. Argument and Facts: Kraken advertised compliance with SOC 2, ISO 27001, and robust email protections (Exhibits 34–37, 52–54), implying that communications from support@kraken.com were secure (Exhibit 53). **These representations influenced Plaintiff to trust such emails, including the phishing message from "Sebastian." The unfortunate reality was—that the form allowed spoofing with no sender or recipient verification— which contradicts the very security claims listed above (Exhibits 34-37)**.

15. Consent to the arbitration clause was obtained under these false pretenses, invalidating the agreement.

**Supporting Authority:**

- 16. Rosenthal v. Great Western Fin. Securities Corp., 14 Cal.4th 394 (1996)

- 17. Doctor's Assocs. v. Casarotto, 517 U.S. 681 (1996)

## C. Procedural and Substantive Unconscionability

18. Procedural and Substantive Unconscionability

19. Rule Statement: **Arbitration agreements are invalid when they are both procedurally and substantively unconscionable—i.e., imposed in a manner that deprives a party of meaningful choice and contain terms that are unfairly one-sided.**

20. Argument and Facts: Kraken selectively enforces its Terms of Service against registered users like Plaintiff, while allowing anonymous scammers to exploit its systems without constraint. **This "selective enforcement" undermines the mutuality required for enforceable contracts.**

21. **Procedurally, Kraken's web form allowed anonymous users to weaponize the platform without consent, but forces only known users into arbitration.** Substantively, this creates a one-sided power dynamic that **shields Kraken from liability while exposing users to harm.**

22. Furthermore, **Kraken's failure to timely notify Plaintiff of the form's misuse (64 days after the incident, well beyond the 30-day arbitration filing window in its own Terms) deprived Plaintiff of a fair opportunity to invoke arbitration—making enforcement fundamentally unfair.** Exhibits 26–28, 59, 60: These show Kraken's evasive and delayed support responses and evidence

that Plaintiff had no realistic way to invoke arbitration within the stated deadline. Strengthens **procedural unfairness**.

**Supporting Authority:**

1. 23. Armendariz v. Foundation Health Psychcare Servs., 24 Cal.4th 83 (2000)

2. 24. Nagrampa v. MailCoups, Inc., 469 F.3d 1257 (9th Cir. 2006)

### D. Public Policy and the Need for Transparency

25. Rule Statement: **Courts may refuse to enforce arbitration clauses where enforcement would violate public policy,** particularly where disputes implicate consumer protection, transparency, or concealment of significant systemic flaws. Arbitration cannot be used to cloak matters of substantial public interest behind closed-door confidentiality.

26. As the Supreme Court recognized in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991), arbitration is not enforceable where it would undermine substantive rights or public policy protected by statute. While Gilmer upheld arbitration of age discrimination claims under the ADEA, it emphasized that courts must ensure arbitration remains an adequate forum to vindicate public statutory rights—and must be wary of agreements that suppress public accountability.

27. Here, **Plaintiff alleges a systemic design flaw in Kraken's infrastructure that allowed anonymous impersonation of employees using official company**

11

systems—**posing ongoing risks not just to customers, but to the broader financial ecosystem**. This form was silently patched after the incident (Exhibits 3, 47), **with no public disclosure**, despite being used to impersonate Kraken employees and steal over $200,000 in assets. **Exhibits 32, 39, 40**: Industry-wide security risk (Ex. 32), false claims of proactive security posture (Ex. 39), and failure to honor bug bounty (Ex. 40) could support public interest in adjudication over private arbitration.

28. **Judicial review is essential here to expose this vector of harm and prevent future exploitation**—particularly because Kraken refuses to acknowledge it publicly and because the flaw implicates widespread regulatory and cybersecurity concerns.

**Supporting Authority:**

- 29. Gilmer, 500 U.S. at 33 — "[W]e are well past the time when arbitration was automatically disfavored... but public policy can still bar enforcement of arbitration where arbitration would undermine the purpose of the statute."

- 30. Ragone v. Atlantic Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) — Arbitration clauses cannot be enforced if they operate to "prevent the effective vindication" of statutory rights.

- 31. Murray v. UBS Securities, LLC, 2020 WL 7384722, at *5 (S.D.N.Y. Dec. 16, 2020) — Courts are empowered to deny arbitration where

12

enforcement would suppress "important public interests in accountability or disclosure".

- 32. In re Equifax Inc. Customer Data Sec. Breach Litig., 362 F. Supp. 3d 1295, 1326–27 (N.D. Ga. 2019) — Arbitration unenforceable where the clause would shield a company from responsibility for a major data security failure implicating millions of consumers.

**Argument and Facts:**

- 33. The phishing exploit described here was enabled not through hacking, but by Kraken's own system, which allowed anonymous individuals to spoof support@kraken.com using a public web form (Exhibits 3, 8, 31).

- 34. Kraken's concealment of this flaw and refusal to notify other users or regulators invites ongoing harm.

- 35. A ruling compelling arbitration would effectively silence the only known case uncovering this exploit—and would prevent the development of public awareness or future safeguards.

- 36. In contrast to Gilmer, this case does not involve a statutory scheme with robust enforcement alternatives—without this suit, no mechanism exists for public exposure or deterrence.

37. Conclusion: This dispute transcends a private contractual disagreement. It implicates the integrity of online financial services, the duty of transparency in cybersecurity, and the right of the public to be warned about threats to digital

infrastructure. Arbitration would shroud these issues in secrecy, violating the public interest and undermining the very policies the court system is designed to protect.

**E. Breach of Duty and Failure of Notice (Contractual and Statutory)**

38. Rule Statement: **Arbitration clauses are unenforceable where the enforcing party has breached its own duties or failed to give proper notice that affects the other party's ability to comply with the arbitration terms.**

39. Argument and Facts: **Kraken's Terms impose a 30-day deadline to initiate arbitration (Exhibit 6, p. 20). Kraken failed to notify Plaintiff of the details of the security compromise until more than two months after the incident** (and only did this at that time due to Plaintiff's continued persistence), making compliance impossible for Plaintiff. This delay violates both the contract and underlying data protection duties under SOC 2 and ISO 27001.

40. Kraken cannot demand arbitration after actively frustrating the conditions necessary to trigger it.

**Supporting Authority:**

- *Wilko v. Swan*, 346 U.S. 427 (1953)

- *In re Equifax Inc.*, 362 F. Supp. 3d 1295 (N.D. Ga. 2019)

**Conclusion on Arbitration Clause Unenforceability**

41. For all of the above reasons—lack of mutual assent, fraudulent inducement, unconscionability, overriding public policy, and breach of both duty and statutory

notice obligations—Kraken's arbitration clause is invalid and unenforceable under the Federal Arbitration Act and general principles of contract law. Plaintiff respectfully also requests that this Court retain jurisdiction and deny any future motions to compel arbitration.

**PARTIES**

42. Plaintiff Geoffrey Jacobs is an individual residing in Stamford, Connecticut, and was a registered user of Kraken's platform at all times relevant to this Complaint.

43. Defendant Payward, Inc. and Payward Ventures, Inc. operate Kraken, a cryptocurrency exchange headquartered at 100 Pine St Ste 1250, San Francisco, CA, 94111-5235.

**FACTUAL ALLEGATIONS**

**Proof of Kraken's Knowledge and System Vulnerability**

44. Plaintiff includes this consolidated subsection to avoid repetition across claims. This section documents how Kraken knew or should have known about its insecure web form and its role in enabling phishing attacks, including detailed testing by Plaintiff and a police investigator.

45. Kraken's public-facing "Sign-in troubleshooting & Account security" web form allowed any anonymous party to generate an email from support@kraken.com to any email address, impersonating a Kraken employee via rotating names such as "Sebastian" and "Helen." This form lacked basic sender or

recipient verification and did not require the submitting party to have a Kraken account.

46. Plaintiff was victimized by an anonymous party who used the form on May 2, 2024.

47. Plaintiff, after learning of this form through Kraken Legal via email (July 5 and 8, 2024), tested it and verified these flaws.

48. **In a blind test, Plaintiff submitted the police investigator's police department email to the form, which produced an email from "Helen" at support@kraken.com.** The investigator (**Detective Stempien of the Stamford, CT Police Department**) received the email. **Then confirmed his professional opinion of the form as enabling phishing and social engineering.** A phishing attack vector. See Exhibits 43, 44.

49. Email header analysis showed emails from the scammer, Plaintiff, and Kraken support were indistinguishable in origin, demonstrating the spoofing risk. See exhibits 62, 63, 64.

50. Kraken silently modified the form in late July 2024, removing employee names and requiring some recipient verification—suggesting acknowledgment of the security flaw. These modifications came only after Plaintiff spent 2 months of investigating the incident and submitting legal complaints and direct recommendations to Kraken support. Then to Kraken Legal.

51. However, Kraken never admitted the vulnerabilities of the form.

16

**Supporting evidence: Exhibits 3, 31, 43, 44, 47, 60, 62–64.**

**Timeline of Events**

**Before May 2, 2024 (Pre-Attack Context)**

1. 52. Kraken publishes a publicly accessible "Sign-in troubleshooting & Account security" web form on its website (Exhibit 3).

2. 53. The form generates emails that are sent from support@kraken.com

3. 54. support@kraken.com is the same email address used by Kraken support employees. An email address that Kraken has promised as being secure. See Exhibit 53.

4. 55. A Kraken trouble ticket is also created. That info is within the email sent out.

5. 56. The e**mails are signed by employee-like names** (e.g., "Sebastian") (Exhibit 8).

6. 57. **This gives the recipient of the emails the perception that the email received was sent by a particular Kraken employee**.

7. 58. T**his is done without identity verification of the party sending the email. The party utilizing the web form is the party that is truly sending the email, via the form.**

8. 59. This is done without verifying if the submitted email is even connected to an existing Kraken account.

9. 60. These emails are sent to the email address that is entered into the box for "email address".

10. 61. The form is accessible and utilized completely anonymously.

11. 62. The party who navigates to the web form and enters data into it could be anyone.

12. 63. Yet the emails that are produced are signed as if a Kraken employee was the party who sent them. However, the party who actually did this is not identified in any way. See Exhibits 62, 63 ,64.

13. 64. The form rotates the "sender" name every ~24 hours (e.g., Sebastian, Helen, Winston).

14. 65. Scammers could easily verify the name currently in use by entering their own email address first, into the web form. The scammer would then receive a Kraken support email and see the name that is currently being used.

15. 66. Scammer would then be able to call their phishing victim, whose email address is then entered into the web form, as that named identity (from Kraken support).

16. 67. The unsuspecting victim then receives the Kraken email signed by that supposed Kraken employee. The victim also receives a phone call from a person (the scammer) who identifies him/herself as that same person (from

Kraken) who emailed the victim. The scammer has a great advantage over his/her victim, and the victim has no idea of what is really going on.

17. 68. Kraken also made a great deal of security claims prior to May 2, 2024 (the date of the incident). Kraken made claims of security certifications (Exhibit 35) & (Exhibit 37). Promises of strong account security (Exhibit 34). Strong email security (Exhibit 52) & (Exhibit 53) & (Exhibit 54). Strong user data security (Exhibit 36). The claim of "security above everything" (Exhibit 39). How Kraken manages client security (Exhibit 41). Even a bug bounty system that rewards those who constructively identify bugs on Kraken's system (Exhibit 40).

18. 69. **The vulnerabilities of this form contradict the standards of those claims. The principles of those claims. The security expectations that Kraken customers would demand due to those claims.**

**May 2, 2024 (Phishing Incident)**

1. 70. At 8:19PM, while not using his computer, Plaintiff is called by a scammer identifying as "Sebastian from Kraken Support" (Exhibit 9).

2. 71. While on the call, **the plaintiff also receives an email from support@kraken.com signed by the name as the caller "Sebastian,"** and a Kraken trouble ticket is also generated (Exhibit 8).

3. 72. Scammer used this email as evidence that he is a Kraken employee. The email was received in a way that supported that this

person's name is Sebastian and he has a functional email account with Kraken support.

4. 73. A mailbox on a business's email system is typically only available to employees of that business. Not available to anonymous people using a public web form.

5. 74. **Scammer also provides Plaintiff's full social security number and driver's license number, as further evidence of his Kraken affiliation.**

6. 75. **Scammer claims (as a Kraken support employee) that hackers are in Plaintiff's Kraken account.**

7. 76. **That they are attempting to withdrawal plaintiff's NNS (Network Nervous System) wallets (neurons) of 15,000 ICP tokens ($200,000) through Plaintiff's Kraken account by creating withdrawal addresses on Plaintiff's Kraken account.**

8. 77. **Plaintiff sees the withdrawal addresses suddenly appear on his account. One at a time.**

9. 78. Plaintiff deletes the address that appears. As plaintiff does this an additional address appears on his Kraken account. This happens 4 times.

10. 79. Sebastian, who Plaintiff still believes is a Kraken employee seems incapable of controlling what the supposed hackers are doing on

Plaintiff's Kraken account. **This only increases the stress level of the situation for the Plaintiff.**

11. 80. **"Sebastian" tells Plaintiff that the hackers are working on connecting one of these addresses with the ICP wallets/Neurons, and once they succeed, the ICP are gone. There will be no getting them back. The value of those tokens at the time was approximately $200,000 at the time.**

12. 81. "Sebastian" directed Plaintiff to a website which resembled Kraken's website (Exhibit 10).

13. 82. The website accepted Plaintiff's credentials, making Plaintiff believe that this site was legitimate (Exhibit 11).

14. 83. **Plaintiff was told by "Sebastian" that this is a utility site of Kraken's that would disconnect his wallets containing the approximately 15,000 ICP tokens from his Kraken account, and prevent their withdrawal by the hackers.**

15. 84. **Since this supposed Kraken support employee couldn't control what was going on, and supposedly Kraken was doing this to help Plaintiff, Plaintiff eventually followed "Sebastian's" instructions.**

16. 85. **It took over more than 2 hours of escalating pressure.** Of being worn down. **Plaintiff, is eventually manipulated into entering his NNS wallet's seed phrase into a website resembling Kraken.**

17. 86. **ICP tokens are lost after the scammer accesses and takes possession plaintiff's ICP NNS wallet (Internet ID).**

18. 87. During the time of this phishing attack, the scammer:

19. 88. Was in plaintiff's Kraken account simultaneously, as Plaintiff was too.

20. 89. **The scammer created withdrawal addresses on Plaintiff's Kraken account without triggering any Kraken confirmation emails (as guaranteed by Kraken) (Exhibit 15) (Exhibit 55).**

21. 90. **If emails were triggered then the scammer received them. The Plaintiff did not.**

22. 91. At the least, what can be assessed is that scammer used a different Kraken account to access Plaintiff's account. Possibly an admin level Kraken account, to bypass 2FA protection (that was present on Plaintiff's Kraken account).

23. 92. The account that the scammer used was the account that created withdrawal addresses. That would have been the account which received the confirmation emails sent by Kraken to confirm the

address creation, and then enable the withdrawal address on Plaintiff's
Kraken account.

24. 93. **Plaintiff never received those 4 confirmation emails.**

25. 94. **Plaintiff did, however, receive Kraken confirmation emails of
those addresses being deleted. The only action, of deleting, that
Plaintiff's Kraken account did execute regarding those addresses
(Exhibit 16).**

26. 95. Plaintiff had always received emails when using Kraken
legitimately on prior dates (Exhibit 14). The emails would have the
title: "Kraken Alert - Withdrawal Address Confirmation Required".
They would state: "A new withdrawal address has been added to your
Kraken account." "As a security precaution, the withdrawal address
cannot be used until it is confirmed. If you are sure this is correct,
please confirm the address by clicking the link below". **Besides a link
to confirm, it would also provide the IP address of the party
making the request**, "The IP address recorded for this action was:"
**There was also a link to disable one's Kraken account in the event
of one's account being compromised.**

27. 96. Plaintiff did not receive the 4 Kraken email messages that would
have been produced from the 4 addresses that the scammer created. If
he did he would not have clicked on the link to activate the addresses.

They would not have been seen on his Kraken account if that did not happen. But they were on his Kraken account, so the links were clicked by the scammer. His IP address would have also been recorded in the confirmation emails.

28. 97. **Kraken support never provided those emails to the Plaintiff, nor the investigator.**

29. 98. **Producing those emails seems like a logical first step in finding out who the scammer was. If that is indeed the goal.**

**May 2, 2024 – Post-Incident**

3. 99. Plaintff reports issue to Kraken within an hour (12:05 AM on May 3, 2024) after the phishing attack ends, when Plaintiff realizes that he can no longer log on to Dfinity's website (Dfinity is the company that created and manages the ICP token) with his Internet ID, to access the 2 NNS neurons he possessed before the phishing attack (Exhibit 26).

4. 100. Plaintiff reports issue by emailing Kraken support at support@kraken.com, the very same address used by the scammer. Responding to the very same message that was produced by the scammer via Kraken's web form.

5. 101. At this time, Plaintiff suspects a security breach of Kraken's email/ticket system, or internal compromise (as a way of explaining how he was victimized).

24

6. 102. Kraken's response did not reflect immediate recognition of the platform's role in the incident. Kraken shows no surprise in learning what Plaintiff was reporting to them. Which appeared to be a scenario of some type of lapse in security.

7. 103. Plaintiff asks Kraken to explain how he was victimized (Exhibit 27).

8. 104. **Kraken responds to Plaintiff, but does not answer his inquiry. Instead focuses on restoring Plaintiff's account functionality (Exhibit 27, 28).**

9. 105. Plaintiff cooperates with Kraken's request, in hope of his inquiry being answered.

10. 106. No fraud alerts or investigation was initiated by Kraken.

**May 7, 2024**

1. 107. Plaintiff inquires with Dfinity (the company that created and manages the ICP token), in an effort to get their help in reclaiming the ICP tokens that were lost (Exhibit 19). Or to at least freeze them for some time.

2. 108. Dfinity confirms (via email) that the NNS wallet that Plaintiff referred to was altered at the specified time on May 2, 2024. However, Dfinity cannot reverse what was done, or take control of the NNS wallet See Exhibit 20.

3.  109. Dfinity told Plaintiff that the only way that he can recover the ICP is by obtaining the new recovery phrase that the scammer applied to the NNS wallet. That freezing them is not an option.

**May 19, 2024**

1.  110. Kraken support exchanges emails with Plaintiff— for 17 days after the incident—with generic messages and no clear concern or investigation. Kraken focused on restoring Plaintiff's Kraken account's trading functionality, instead of focusing on how Plaintiff was robbed and who robbed him. See Exhibit 28.

2.  111. On May 19th Plaintiff receives a message from "Ragnar," and later "Adam," suggesting he contact law enforcement. **This is where Kraken tells Plaintiff that they will only communicate with the authorities from that point forward.**

3.  112. **Investigator Stempien, from the Stamford Police Department, had already been on the case, on a criminal investigative basis, he was notified.** He was already cc'ed on all prior emails to Kraken. He was updated with this new development.

4.  113. Communication with Kraken was then in Investigator Stempien's hands.

5. 114. **Plaintiff, nevertheless, continued investigation on his own,** as well. Plaintiff has some communication with Kraken support, but nothing substantial (Exhibit 59).

6. 115. Plaintiff has been actively pursuing this, investigating it, researching it, every day since it occurred.

7. 116. **In late June Plaintiff prints out existing evidence, and stated his theory held at the time (of Kraken's system being hacked or there being a rogue Kraken employee named Sebastian), and he sent the package to Kraken's legal department by postal mail.**

**July 5, 2024**

1. 117. **Plaintiff then receives an email from Daniel Clarkson, of Kraken's legal team (Exhibit 31).**

2. 118. **Mr. Clarkson states to Plaintiff that the scammer used Kraken's web form to send emails to Plaintiff, and generate support tickets.** That those were the emails that Plaintiff received on May 2, 2024 . **The emails from Sebastian of Kraken support, were really from an anonymous party. Not from Sebastian of Kraken support.**

3. 119. Plaintiff had no prior knowledge of the web form that Mr. Clarkson was referring to, so he asked Mr. Clarkson to confirm what he claimed in his first email to Plaintiff.

**July 8, 2024**

1. 120. **Mr. Clarkson confirms, in a second email, that the scammer used Kraken's web form to victimize Plaintiff.** That the emails Plaintiff received which impersonated a Kraken employee named Sebastian originated from Kraken's web form (Exhibit 31).

2. 121. **The fact that Kraken's web form can be used anonymously to generate an email that impersonates Kraken support is completely contradictory to the Kraken claim of secure emails from Kraken** – "Is this email from Kraken? Secure emails from Kraken include:". In that official Kraken documentation it states: "Secure emails from Kraken include:" "". (Exhibit 53).

3. 122. T**hat Kraken documentation states that emails received from  are secure.** That they can be trusted (Exhibit 53). The email Plaintff received on May 2, 2024 is a phishing email, by Kraken's own definition of a phishing email, where it states that an "occurs when you receive an unsolicited email"..."This could be a scammer who is impersonating Kraken" (Exhibit 54).

**July 2024 (Shortly After Mr. Clarkson Email Exchange with Plaintiff)**

123.     1. Plaintiff then tests the web form. (Exhibit 3) & (Exhibit 60) He confirms certain flaws in the very Kraken form that Mr. Clarkson refers to in his emails. Plaintiff discovers:

124. A.) **The wording of the emails generated by the form now differs slightly from the email Plaintiff received on May 2, 2024 from the scammer**. Showing Defendant began altering the web form's functionality slightly. Discovery was made on July 9, 2024. But the other flaws that existed on the form still exist on the version observed on July 9, 2024.

125. **For example, the July 9, 2024 version states in the email "Kraken will never contact you via phone, SMS or social media unless you asked us to.". The email received on May 2, 2024 did not state that.**

126. B.) **Form's usage is still completely anonymous.** There is no "sender authentication" provided by the web form.

127. C.) **Form accepts any email address without verification**. There is no "recipient validation".

128. D.) **Form does not validate any information entered into it, against a Kraken user database.** This is demonstrated by the info entered into it on See Exhibit 3.

129. E.) Form sends out an email to the email address entered into it.

130. F.) Form also creates a Kraken trouble ticket that is included in the email.

131. G.) That email comes to the recipient from the same email address that is used by the Kraken support team, support@kraken.com

132. **In the case of a phishing attack, the email is sent through the email account via the web form, however it was not the Kraken support team that sent it (even though it appears as such). It was the anonymous party, who navigated to the public facing web form, who sent it to the email address that he/she entered into the form. The unsuspecting phishing victim's email address. This enables the easy impersonation of Kraken support employees.**

133. H.) The emails sent are signed by a rotation of names that are applied for approximately 24 hours each. This makes each email appear as if they are being sent out to the recipients by a particular Kraken employee, personally. This is a misleading use of virtual identities. This is outside of the principles of transparency and accountability in trustworthy communications.

134. I.) From the email address (support@kraken.com) and all of the information within the email header, the true party who sent the email cannot be determined.. If one were to review the email details from email sent by the scammer, the emails sent by Kraken support, and the emails sent by the Plaintiff as he tested the form out, one can not determine which party sent which email. The sending parties are indistinguishable from anything within the emails, and email header information. They are all identified as being Kraken support (Email Header from Kraken Support Email- Exhibit 62, Email Header from Plaintiff Email-Testing Form- Exhibit 63, Email Header from Scammer Email- Exhibit 64).

    1.  135. Kraken's form mimicked employee identity using the same trusted address that Kraken told users to trust. See exhibit 52, 53,

54. This was a breach not just of privacy but of brand representation and user trust.

2. 136. July 9, 2024- **After learning about the Kraken web form Plaintiff entered Investigator Stempien's police department email address into the form and clicked send.**

3. 137. **Investigator Stempien then received an email** from "Helen". From the email address of:  (Exhibit 44).

4. 138. Plaintiff did this prior to telling Investigator Stempien about what he learned (about Kraken's web form) in order to get a genuine response from the investigator. **This was a blind test**.

5. 139. **Investigator Stempien was surprised** to have received the Kraken email  on his police department email address. **He confirmed to Plaintiff his professional opinion that the Kraken's form enables phishing and social engineering (Exhibit 43).**

6. 140. This email, that Investigator Stempien received from Kraken, **proved how easy it was to use Kraken's web form to perform a phishing attack. It was the plaintiff who sent the investigator the email, not Helen of Kraken support.** This was **even able to deceive an expert.** The investigator. It would be even that much

more effective, in terms of deception, on somebody who is not an

expert on cyber crimes.

**July 13, 2024**

141. Plaintiff then replies to Mr. Clarkson's emails. He points out the many faults

with the web form that Mr. Clarkson referred to in his emails to Plaintiff. (Exhibit

31)

142. So that's the publicly online form on Kraken's site. And, in my opinion, what I have described about Kraken's form stands in stark contrast with the idea that Kraken is even the least bit concerned about their client's security. What's even more shocking is that you, yourself, after reading what I mailed to your office (on June 17th) knew how most of what happened to me took place. Through the online form. You made it very clear that you were very aware of the potential flaws with this online form. The very flaws that I just pointed out in this email. This is not consistent with a security minded organization. Not in my opinion.

143. Well, Mr. Clarkson, that form allows so much of Kraken's business to be manipulated (y Kraken's email system, Kraken's clients, their holdings, their trust in Kraken, Kraken's reputation, etc..) that the form is a hack of Kraken's system in and of itself. With that form being publicly accessible on Kraken's website, and running the way that it currently does, your system is indeed compromised. For example, the perpetrators don't even have to hack into Kraken's email to send valid emails to victims. All they need to do is use that form on Kraken's website. That's all that they have to do.

144. If hackers want to be able to send emails out from other company's email systems they have to first hack that email system. But not with Kraken. The hackers just use that form. Please explain to me how this is a good idea?

145. This fact stands in stark contrast with your July 5th statement of "there is no basis for your claims that Kraken was "hacked," that our system was "compromised,". That statement is very inaccurate, in my opinion.

146. Beyond all of this, what also makes this even more problematic is that there's no customer service phone number to call in order to speak with Kraken.

147.   With the form being manipulated like this, and your clients being manipulated by the perpetrators so easily, Kraken is only inviting trouble. I believe that if your clients were made aware of this feature, and the dangers that it presents, that they would insist that it be removed. If not removed,altered significantly. The other option would be for Kraken users to be made aware of the form and then have the option for their email address to be removed from the form's ability to send out emails to it. But that would option would have to be provided to anyone in the entire world with an email address to be fully effective."

148. Plaintiff even made many suggestions on how to fix those issues and secure

the web form (Exhibit 31).

149.   How about not implementing a name in the emails that are sent out? Use a name that makes it clear that a person is not behind this email. Something like "Kraken's Virtual Assistant", maybe. That would eliminate people from being able to call account holders as the "person" who emailed them. Then maybe also implement the validation of the info      being called upon by the form? Requiring more to be known than just someone's email address.

150.   I say this not only because I feel that this form is a threat to Kraken users, but also others as well. The same scheme that was used on me could be used on anyone with an email address and a phone number. This is an unnecessary threat to them and also to Kraken's reputation.

151.   So there is the very basis, that you claimed to be nonexistent in your July 5th email, for  Kraken being both hacked and compromised. This hack and compromise jeopardizes the  security of Kraken's clients, as well as threatens anyone with an email address and a      phone number. It's certainly plain to see, in my opinion.

**Late July**

152. Kraken silently modifies the web form in line with the plaintiff's

recommendations (Exhibit 47):

1.   153. No longer includes supposed employee names in the emails sent out.

2.   154. Verifies email is tied to an actual Kraken account.

33

3.  155. Reduces request for unverified personal info.

4.  156. Plaintiff interprets this as implied acknowledgment of prior form insecurity. **If Kraken's web form was in this design on May 2, 2024 Plaintiff would not have been victimized like he was on May 2, 2024.**

## Late 2024 into 2025

1.  157. **Plaintiff continues contacting Kraken legal for resolution and proposes settlement, by just restoring the ICP tokens that he was robbed of due to the prior vulnerabilities in Kraken's web form. The latest of this was sent on Dec 17, 2024, 2:27 PM  (Exhibit 65)**.

2.  158. Kraken remains silent and does not respond to Plaintiff, whatsoever.

3.  159. Plaintiff then begins the process of preparing to fight for justice in court. Time is spent gathering up documents and extensive proof: screenshots, emails, tickets, confirmation messages, and communications with Dfinity and Kraken support, and the investigator. As well as extensive legal research, and then modified actions as the learning process continued.

## Other

160. Outside of the details of the timeline, yet connected with it in terms of evidence, Plaintiff has attached 6 other attachments:

1.  161. Evidence of the price of the ICP token on May 2, 2024 (Exhibit 12)

34

2.  162. Screen shot of the Kraken ledger upon Plaintiff's withdrawal of the of 15,011 ICP tokens on 4/19/24 (Exhibit 21)

3.  163. Ledger Live to NNS (Dfinity's Network Nervous System) (Exhibit 23)

4.  164. ICP Dashboard- ICP Holdings- (Exhibit 24)

5.  165. 2 ICP NNS Neurons (wallets) (Exhibit 25)

**End of Timeline**

**FACTUAL ALLEGATION - DETAILED NARRATIVE OF THE INCIDENT AND AFTERMATH**

**Prior to May 2, 2024**

166. Defendant Kraken maintained a publicly accessible "Sign-in troubleshooting & Account security" web form (Exhibit 3). This form allowed anonymous users to input any email address and, without verification or validation, triggered Kraken's system to send an email from support@kraken.com, signed by a rotating name impersonating a Kraken employee (e.g., Helen, Sebastian, Winston, Paul, Mary) (Exhibit 8). A support ticket was also automatically generated as part of the email.

167. The form:

1.  168. Did not authenticate whether the submitted email was associated with an actual Kraken account.

2. 169. Did not require the user of the form to authenticate or provide any identification.

3. 170. Allowed any user to trigger emails to any recipient with no identity verification.

4. 171. Enabled phishing attacks by creating the appearance of legitimate Kraken support, employee communication.

5. 172. Contradicted Kraken's own public representations of high security standards, including SOC 2 compliance (Exhibit 35), ISO 27001 certification (Exhibit 37), strong email security (Exhibits 52, 53, 54), and user data protection (Exhibit 36).

173. Scammers could test the form by submitting their own email address to discover the current employee name being used, which rotated approximately every 24 hours. This information allowed attackers to set up credible impersonation scenarios. Impersonating Kraken support employees.

**May 2, 2024 — Initiation of Phishing Attack**

174. At approximately 8:19 PM ET (Exhibit 9), Plaintiff received a phone call from an individual claiming to be "Sebastian from Kraken Support." While on the call, Plaintiff received an email from support@kraken.com, signed "Sebastian," containing a support ticket (Exhibit 8). The caller brought this email to Plaintiff's attention as it was being sent. The call and email arrived in tandem, reinforcing the caller's false identity.

175. The scammer also read aloud Plaintiff's full Social Security Number and Driver's License number—information Kraken required during account creation —further legitimizing the impersonation. The caller claimed hackers were accessing Plaintiff's ICP tokens through his Kraken account and were attempting to withdraw 15,011 tokens by creating new withdrawal addresses.

176. Plaintiff observed withdrawal addresses that were added to his Kraken account in real time, one after another. As he deleted each, a new one appeared— four in total. No confirmation emails were received for these additions, violating Kraken's stated policy (Exhibit 15, 55). However, deletion confirmation emails were received (Exhibit 16), proving that email delivery was functioning and highlighting the absence of verification for additions of addresses.

177. Either another Kraken account was used to create those withdrawal addresses, which would have been the account that would then receive the confirmation emails sent out, or Kraken's system is flawed. Nevertheless, those confirmation emails were guaranteed by Kraken, and Plaintiff did not receive them.

178. Stressed, manipulated, and convinced of an emergency, Plaintiff followed "Sebastian's" instructions to visit a fraudulent website resembling Kraken (Exhibit 10). The website accepted Plaintiff's credentials (Exhibit 11), increasing its perceived legitimacy. After over two hours of escalating pressure, Plaintiff entered his NNS wallet seed phrase, believing it would disconnect his wallet from Kraken and prevent token theft.

179. This led to the theft of Plaintiff's 15,011 ICP tokens, worth approximately $200,000 at the time of the theft.

**May 2–3, 2024 — Immediate Aftermath**

180. By 12:05 AM on May 3, Plaintiff emailed support@kraken.com (Exhibit 27) —the very same address used by the scammer—responding to the original spoofed email. Plaintiff requested urgent assistance and expressed concern about possible compromise of Kraken's internal systems.

181. Kraken's response prioritized restoring Plaintiff's trading account functionality, avoiding Plaintiff's central question: how did this happen? (Exhibits 27, 28). Kraken demonstrated no surprise, no urgency or indication of internal concern, investigation, or fraud alert.

**May 7, 2024 — Dfinity Contact**

182. Plaintiff contacted Dfinity, the creators of ICP (Exhibit 19). Dfinity confirmed that Plaintiff's NNS wallet had been altered during the incident but stated they could not reverse the change or freeze the wallet. The only method of recovery would be to obtain the new seed phrase, which was now in the scammer's possession (Exhibit 20).

**May 19, 2024 — Delayed Kraken Response**

183. Kraken issued a vague reply from employees "Ragnar" and "Adam," suggesting law enforcement involvement, and stated they would only correspond with authorities from that point forward. Investigator Michael Stempien of the

Stamford Police Department was already investigating the incident, on a criminal basis, and had been copied on prior communications (Exhibit 59).

**Plaintiff's Independent Investigation**

184. Plaintiff continued investigating. In June, he printed a packet of evidence and mailed it (postal mail) to Kraken's legal department, hypothesizing either internal compromise or an external exploit via their system.

**July 5–8, 2024 — Kraken Admission**

185. Plaintiff received an email from Daniel Clarkson of Kraken Legal (Exhibit 31), stating the phishing email had been generated using Kraken's "Sign-in troubleshooting & Account security" web form. This was Plaintiff's first awareness of the form.

186. On July 8, Mr. Clarkson confirmed that the impersonating email from "Sebastian" originated from this Kraken web form (Exhibit 31).

**July 9, 2024 — Plaintiff Tests the Form**

1. 187. Plaintiff tested the form and confirmed its flaws (Exhibit 3, 60):

2. 188. It accepted arbitrary email addresses with no validation.

3. 189. Emails appeared from support@kraken.com.

4. 190. Emails were signed by rotating names.

5. 191. The originating party (who sent the email via the form) was untraceable.

6.   192. The sending parties (the scammer, Kraken support, and the Plaintiff as he tested the form) are all indistinguishable from each other from anything within the emails, and email header information.

7.   193. Plaintiff also noticed that the email that was sent out from the form, in the 2nd sentence, now stated, "If you did not ask for support, let us know as soon as possible so we can secure your account." The email generated from the form by the scammer on May 2, 2024 did not state this (Exhibit 60). This proves the beginning of Kraken silently correcting their web form.

194. In a blind test, Plaintiff sent a test message from the web form to Detective Stempien's police email. Det. Stempien received an email from "Helen" of Kraken support (Exhibit 44). Deteective Stempien was surprised and confirmed his opinion of the form's capacity to facilitate "phishing" and "social engineering" (Exhibit 43).

195. Plaintiff documented and emailed Kraken Legal a detailed critique of the form's design, offering suggestions to fix the issues (Exhibit 31).

**Late July 2024 — Silent Modifications by Kraken**

196. Kraken updated the form without public disclosure, indicating awareness of prior flaws.  (Exhibit 47):

1.   197. Removed supposed employee names from the emails sent out.

2.   198. Verified recipient email matched a Kraken account.

   3.  199. Reduced unnecessary personal info fields.

200. Plaintiff viewed these changes as tacit acknowledgment of prior flaws. If the

form had these safeguards on May 2, the phishing attack would likely not have

occurred.

**Late 2024 – Early 2025 — Litigation Preparation**

201. Plaintiff continued requesting restitution from Kraken (Exhibit 65). On

December 17, 2024, he submitted a final settlement proposal of offering to just

restore the ICP that was stolen. Kraken did not respond. (Plaintiff  no longer

makes that offer to Kraken).

202. Plaintiff began preparing for litigation:

   1.  203. Compiled documentation: emails, tickets, screenshots.

   2.  204. Conducted extensive legal research.

   3.  205. Gathered communications with Kraken, Dfinity, and Investigator

      Stempien.

   4.  206. Refined legal theories and causes of action.

207. This effort culminated in the current civil complaint.

**ARTICLE III STANDING**

208. Plaintiff Geoffrey Jacobs has standing to bring this action under Article III of
the U.S. Constitution because:

   1.  209. Concrete Harm (Injury-in-Fact): Plaintiff suffered a specific,
      measurable loss of approximately 15,011 ICP tokens—valued at over

$200,000—as a direct result of a phishing attack enabled by Defendants' insecure systems.

2.  210. Traceability (Causal Connection): The injury is traceable to Kraken's negligent design of its public-facing web form, which permitted spoofed emails from "support@kraken.com" and impersonation of Kraken employees—exploited by a third-party attacker to gain unauthorized access to Plaintiff's account and assets.

3.  211. Redressability (Judicial Relief Possible): Plaintiff's injuries are redressable through judicial relief including compensatory damages, punitive damages, and injunctive relief aimed at remedying past harms and preventing future ones. A favorable decision by this Court can restore Plaintiff's losses and help ensure accountability for Defendants' failure to follow basic cybersecurity principles.

212. Accordingly, Plaintiff satisfies the requirements of injury-in-fact, causation, and redressability necessary for standing under Article III.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

(With Per Se Evidence from SOC 2, ISO 27001, and NIST 800-177r1 Violations)

**Jurisdiction**: This claim arises under U.S. and Connecticut law. Jurisdiction is proper under 28 U.S.C. §§ 1331, 1332, and 1367.

213. Plaintiff repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**Overview**:

Kraken owed Plaintiff a duty to implement basic cybersecurity safeguards. Its failure to secure a public-facing web form—despite marketing "industry-leading" protections—enabled a predictable phishing attack. Plaintiff lost approximately $200,000 in cryptocurrency as a result. Defendant's conduct constitutes actionable negligence under both common law and applicable standards.

## ELEMENTS OF NEGLIGENCE

### 1. Duty of Care

214. Kraken, as a financial services provider managing sensitive customer data, had a duty to safeguard its communications and account management features from known threats such as phishing.

- 215. This duty was heightened by Kraken's public representations of SOC 2 and ISO/IEC 27001 compliance, and its statements that emails from "support@kraken.com" were secure and trustworthy.

    - 216. See Timeline (before May 2, 2024); Exhibits 34, 35, 36, 37, 39, 41, 52, 53.

### 2. Breach of Duty

217. Kraken breached this duty in multiple ways:

- 218. By operating an anonymous, spoofable web form (Exhibit 3) that generated official-looking emails from support@kraken.com, without verifying sender identity or Kraken account linkage.

    - 219. See Timeline (before May 2, 2024) and May 2 incident.

- 220. Emails were signed using rotating employee-like names (e.g., "Sebastian"), misleading recipients into believing a Kraken employee was involved (Exhibit 8).

    - 221. See Timeline, May 2; also Exhibit 31 (Kraken admission).

43

- 222. The form enabled phishing attacks that mimicked Kraken support staff, using the same email domain Kraken instructed users to trust (Exhibits 3, 8, 53).

- 223. Kraken failed to notify Plaintiff of abnormal account behavior—specifically, the unauthorized creation of withdrawal addresses (Exhibits 15, 55), for which confirmation emails were never received by Plaintiff (Exhibit 16).

    - 224. See Timeline, May 2.

- 225. Kraken delayed admitting the form flaw for over 60 days and made silent security fixes only after being contacted by Plaintiff and law enforcement (Exhibits 3, 31, 43, 47, 60).

    - 226. See Timeline, July 5–July 9, 2024.

**3. Causation**

227. Kraken's breach directly enabled the phishing attack:

- 228. The scammer used Kraken's web form to send Plaintiff a spoofed support ticket and impersonate a Kraken employee, "Sebastian" (Exhibits 3, 8, 31).

- 229. The impersonation succeeded due to Kraken's misleading form design and its public security claims (Exhibits 34, 39, 52, 53).

- 230. The scammer guided Plaintiff to a spoof site (Exhibits 10, 11) and ultimately obtained the credentials and seed phrase necessary to steal 15,011 ICP tokens.

  - 231. See Timeline, May 2 incident, especially the detailed narrative under "May 2 – Phishing Incident."

## 4. Damages

- 232. Plaintiff suffered the loss of 15,011 ICP tokens, valued at over $200,000 (Exhibits 12, 24, 25).

- 233. He also suffered severe emotional distress and invested significant time in independent investigation and legal preparation over the course of a year.

  - 234. See Timeline (May–December 2024); Exhibits 26–28, 31, 43, 44, 65.

## NEGLIGENCE PER SE

235. Kraken's conduct also violated widely accepted cybersecurity standards:

- 236. NIST SP 800-177r1: Violations related to spoofed messaging, lack of sender/recipient authentication, and impersonation risk (Exhibit 66).

- 237. SOC 2 Type I: Violations under CC1.1, CC2.1, CC6.1, CC6.2, CC6.3, CC6.6, CC7.1, CC7.2, CC.73, CC7.4, CC7.5, CC8.1, CC9.1 (Exhibit 68).

- 238. ISO/IEC 27001: Violations of Annex A.5.17, A.8.23, A.8.9, Clause 6.1.2(c)(1), A.8.4, Annex A.5.15, A.8.1.9, Clause 10.2, 9.1, 9.2, Clause 6.1.3(b)(c), Annex A.8.28, A8.8, Clause 5.1(d)(e), 9.3 (Exhibit 67).

239. These violations further confirm the breach of duty under industry standards.

## COUNT II: GROSS NEGLIGENCE

(With References to Timeline, Exhibits, and Industry Standards)

**Jurisdiction**: Supplemental jurisdiction under 28 U.S.C. § 1367; diversity jurisdiction under § 1332.

240. Plaintiff repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**Overview**:

Kraken's reckless disregard for platform security—including its continued operation of an exploitable support form after the incident, failure to notify users or authorities, and silent remediation of flaws—rises to the level of gross negligence. This conduct endangered users even after being presented with detailed warnings, confirming willful indifference to foreseeable harm.

## ELEMENTS OF GROSS NEGLIGENCE

### 1. Heightened Duty of Care

241. As a digital asset custodian, Kraken had a heightened duty to protect users from sophisticated phishing threats—especially once it was put on notice of the exploit.

- 242. Publicly advertised security credentials (ISO 27001, SOC 2) and claims of advanced user protection (Exhibits 34–37, 39, 41, 53) created user reliance and affirmed this duty.

    - 243. See Timeline (before May 2, 2024).

- 244. The duty increased once Plaintiff alerted Kraken to a suspected internal compromise within hours of the May 2 phishing event (Exhibit 26).

    - 245. See Timeline, May 2–3, 2024. See Exhibit 26, **Plaintiff Emails Kraken support within an hour of theft. To the same address that was used to rob him.**

## 2. Reckless Breach of Duty

246. Kraken's actions reflect more than ordinary negligence. Kraken continued to endanger users after being placed on notice by both Plaintiff and law enforcement:

- 247. Operated an anonymous, spoofable form even after knowing it enabled impersonation of its staff (Exhibits 3, 8, 31).

    - 248. See Timeline, May 2 and July 5–9, 2024.

- 249. Did not issue fraud alerts or investigate the phishing attack after Plaintiff's detailed alerts (Exhibits 26, 27, 28).

- 250. Ignored warnings from law enforcement. **Detective Stempien, an active police investigator, confirmed the phishing mechanism and participated in Plaintiff's blind test (Exhibits 43, 44).**

  - 251. See Timeline, July 9, 2024.

- 252. Silently patched the support form with no public disclosure or notice to Plaintiff or law enforcement (Exhibits 3, 47).

- 253. Ignored SOC 2 and NIST expectations by failing to use common safeguards (e.g., sender authentication, phishing alerting, SPF/DKIM/DMARC protocols) (Exhibit 66).

254. This combination of inaction, concealment, and delayed response constitutes willful disregard of known security threats.

**3. Causation & Foreseeability**

- 255. Phishing is a well-known cybersecurity risk, especially in cryptocurrency platforms (Exhibit 32, page 3 of 8).

- 256. Kraken's form gave the scammer the tools to convincingly impersonate a Kraken employee (Exhibits 3, 8, 31).

  - 257. See Timeline, May 2, 2024.

- 258. The harm was entirely foreseeable. Plaintiff described the exploit to Kraken repeatedly—only to be ignored (Exhibits 26–28, 31, 43).

- 259. Kraken failed to act on forensic leads (e.g., IPs, headers, spoofed ticket) or share confirmation emails as required under its own protocols (Exhibits 15, 16, 55).

### 4. Resulting Harm

- 260. Loss of 15,011 ICP tokens (~$200,000 USD at time of incident) (Exhibits 12, 24, 25).

- 261. Ongoing emotional, investigative, and legal toll (Exhibits 26–28, 31, 43, 65).

- 262. Substantial time spent tracing evidence Kraken failed to disclose or act upon.

### SUPPORTING CASE LAW

- 263. In re Equifax Inc., 362 F. Supp. 3d 1295 (N.D. Ga. 2019) – Failure to disclose known vulnerability held actionable.

- 264. Patco Constr. Co. v. People's United Bank, 684 F.3d 197 (1st Cir. 2012) – Ignoring abnormal activity and fraud indicators supports liability.

- 265. Bell v. Michigan Council 25, 868 F.3d 933 (6th Cir. 2017) – Gross negligence for ignoring clear warnings of harm.

### COUNT III: COMMON LAW FRAUD / MISREPRESENTATION
(With Supporting Evidence from Timeline, Exhibits, and Industry Standards)

**Jurisdiction**: This claim arises under Connecticut common law. Jurisdiction is proper under 28 U.S.C. § 1367 (supplemental) and 28 U.S.C. § 1332 (diversity).

266. Plaintiff repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**Overview**:

Kraken knowingly misrepresented the integrity and security of its communications infrastructure—especially emails sent from support@kraken.com—while operating a form that allowed anyone to spoof such emails anonymously. These misrepresentations, combined with Kraken's failure to disclose the flaw post-incident and its silent remedial changes, constitute actionable fraud and fraudulent concealment.

**ELEMENTS OF FRAUD**

**1. False Representation of Fact**

267. Kraken made specific and measurable representations that were false or misleading:

- 268. Publicly claimed that "Secure emails from Kraken include: support@kraken.com" (Exhibit 53).

- 269. Asserted compliance with SOC 2 and ISO 27001 standards (Exhibits 35, 37).

- 270. Claimed to offer "Industry-leading security" for customer communications (Exhibit 34).

50

- 271. Repeatedly emphasized trustworthiness and protection of personal data (Exhibits 36, 39, 41).

  - 272. See Timeline (before May 2, 2024).

273. Yet these assurances were contradicted by:

- 274. Operation of an insecure public web form that enabled spoofing from support@kraken.com (Exhibits 3, 8, 31, 43, 60).

- 275. Form allowed impersonation through unverified input, rotating names, and lack of linkage to any actual Kraken account.

  - 276. See Timeline (May 2, 2024 incident) and July 5–9 investigation and testing.

## 2. Knowledge of Falsity

277. Kraken either knew or should have known its representations were false:

- 278. Kraken's legal counsel (Daniel Clarkson) admitted that the spoofed email Plaintiff received came from Kraken's own public web form (Exhibit 31).

- 279. Kraken silently modified the form only after Plaintiff's postal submission of evidence and law enforcement involvement (Exhibit 47).

  - 280. See Timeline, June–July 2024.

- 281. Kraken failed to alert other users, regulators, or the public to the exploit, demonstrating an intent to conceal.

- 282. The phishing mechanism operated in contradiction to Kraken's own published documentation and security claims (Exhibits 52–55).

### 3. Intent to Induce Reliance

- 283. Kraken's security claims were clearly intended to assure users—like Plaintiff—that communications from support@kraken.com were legitimate. (Exhibit 53).

- 284. These claims influenced Plaintiff's trust in the phishing email received on May 2, 2024, which was formatted like Kraken's prior communications and contained a legitimate-looking trouble ticket (Exhibit 8).

    - 285. See Timeline, May 2, 2024.

- 286. Kraken created an environment in which its own spoofable communications were indistinguishable from legitimate support messages (Exhibits 8, 31, 53, 54).

### 4. Actual and Justifiable Reliance

287. Plaintiff reasonably relied on the email from support@kraken.com:

- 288. The email and phone call came simultaneously; both used the name "Sebastian," which matched the rotating name in use on the form (Exhibit 8).

- 289. Plaintiff had previously received legitimate Kraken messages from that same email address (Exhibits 14, 15).

- 290. The phishing message included a Kraken support ticket, increasing perceived authenticity.

- 291. Based on Kraken's representations, Plaintiff believed the email and phone call were genuinely from Kraken.

## 5. Resulting Damages

292. Plaintiff was induced to follow the scammer's directions, resulting in:

- 293. Theft of 15,011 ICP tokens (~$200,000 in value) (Exhibits 12, 24, 25).

- 294. Emotional distress, loss of time, and investigative costs in terms of money and a tremendous amount of time.

- 295. Loss was directly traceable to Plaintiff's reliance on Kraken's false and misleading statements.

## ALTERNATIVE THEORY: FRAUDULENT CONCEALMENT

296. Even if affirmative misrepresentations are disputed, Kraken also committed fraud by omission:

- 297. Failed to disclose the spoofable web form or warn users after Plaintiff's phishing attack.

- 298. Concealed the form's flaws from Plaintiff and law enforcement (Exhibit 43).

- 299. Withheld key evidence (e.g., confirmation emails with IPs) that could help identify the attacker (Exhibits 15, 16, 55).

- 300. Silently patched the form in July 2024, removing employee names and verifying Kraken accounts—without public acknowledgment (Exhibit 47).

  - 301. See Timeline, July 9 and Late July.

## SUPPORTING STANDARDS & STATUTES (Per Se Evidence of Fraud)

- 302. SOC 2 Violations: Logical access controls and concealment of security deficiencies (Exhibit 68, TSC CC2.1–2.5, CC6.1–6.3).

- 303. ISO/IEC 27001 Violations: Failures in identity verification, secure communications, and incident response (Exhibit 67).

- 304. NIST SP 800-177r1 Violations: Lack of anti-spoofing controls, impersonation protections (Exhibit 66).

**SUPPORTING CASE LAW**

- 305. Bridgestone/Firestone v. Recovery Credit Servs., 98 F.3d 13 (2d Cir. 1996) – Fraud found where misrepresentation was material, intentional, and caused harm.

- 306. Matsumura v. Benihana Nat'l Corp., 542 F. Supp. 2d 245 (S.D.N.Y. 2008) – Omission of material security risks constitutes fraud by concealment.

- 307. In re Equifax Inc., 362 F. Supp. 3d 1295 (N.D. Ga. 2019) – Misrepresenting cybersecurity compliance supports claims for fraud.

**COUNT IV: DECEPTIVE PUBLIC REPRESENTATIONS**
(15 U.S.C. § 1125(a); Conn. Gen. Stat. § 42-110b)

**Jurisdiction**:

- 308. Federal question jurisdiction under 28 U.S.C. § 1331 (Lanham Act).

- 309. Supplemental jurisdiction under 28 U.S.C. § 1367 (CUTPA).

- 310. Alternatively, jurisdiction under 28 U.S.C. § 1332 (diversity).

311. Plaintiff repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

## A. LANHAM ACT VIOLATION (15 U.S.C. § 1125(a))

**Overview**:

Kraken made materially false and misleading statements in commercial advertising about its security practices and infrastructure. These misrepresentations deceived consumers—including Plaintiff—by falsely claiming a level of protection that did not exist, which directly contributed to Plaintiff's harm.

**Elements:**

**1. False or Misleading Statement in Commercial Advertising**

312. Kraken repeatedly made statements that were objectively false or misleading:

- 313. "Industry-leading security protects your investments" (Exhibit 34).

- 314. "Secure emails from Kraken include: support@kraken.com" (Exhibit 53).

- 315. "What does Kraken do to secure my personal information?" (Exhibit 36).

- 316. "Kraken completes SOC 2, Type I for custody and funding services" (Exhibit 37).

- 317. "Kraken celebrates ISO 27001 certification" (Exhibit 35).

  - 318. See Timeline, Pre-May 2, 2024.

319. These statements conveyed that emails from Kraken—especially from support@kraken.com—were secure and verifiable, when in reality they were spoofable via an anonymous public form (Exhibits 3, 8, 31, 60).

## 2. Use in Interstate Commerce

320. Kraken's platform operates across state and national borders, targeting U.S. users through nationwide advertising and online content.

- 321. See Kraken's promotional materials and platform-wide representations (Exhibits 34–37, 39, 52–55).

## 3. Material Deception Likely to Influence Consumers

322. Kraken's misrepresentations were material to consumer decisions regarding the safety of their funds and data:

- 323. Plaintiff relied on the claim that support@kraken.com was secure, and trusted the email received during the phishing incident (Exhibit 8).

- 324. The email's formatting and ticket appeared legitimate and indistinguishable from prior authentic Kraken communications (Exhibits 14–16, 53).

  - 325. See Timeline, May 2, 2024 Incident.

**4. Likelihood of Deception**

- 326. The spoofable support form made it nearly impossible for users to distinguish between genuine and spoofed Kraken communications (Exhibits 3, 8, 31, 60).

- 327. **Even a professional law enforcement investigator was surprised when he received a spoofed email during Plaintiff's test (Exhibits 43, 44).**

  - 328. See Timeline, July 9, 2024.

**5. Injury**

- 329. Plaintiff suffered direct economic injury—15,011 ICP tokens stolen (~$200,000) (Exhibits 12, 24, 25).

- 330. This loss resulted from deceptive advertising about secure communications, leading to reliance and vulnerability to impersonation.

  - 331. See Timeline, May 2, 2024; Exhibits 8, 10–11, 26–28.

**B. CUTPA VIOLATION (CONN. GEN. STAT. § 42-110b)**
**Two Independent Theories:**
**1. Per Se CUTPA Violation (Standards-Based)**

332. Kraken publicly claimed compliance with key industry standards—then violated them:

- 333. SOC 2 Type I: Violations of TSC CC2.1–2.5, CC6.1–6.3, CC7.1–7.2, CC9.2 (Exhibit 68).

- 334. ISO/IEC 27001: Violations of Annex A.5.17 (identity verification), A.8.9, A.9.2.1, A.13.2.1 (Exhibit 67).

- 335. NIST SP 800-177r1: Failures to implement spoof protection, authentication controls, and secure messaging (Exhibit 66).

336. Publicly advertising adherence to these frameworks while violating their core requirements constitutes a per se violation of CUTPA.

## 2. CUTPA "Cigarette Rule" Violation

### a. Public Policy Violation

- 337. Kraken's failure to warn about or disable its spoofable web form violated public policy encouraging cybersecurity, fraud prevention, and transparency.

- 338. Public-facing forms allowing identity spoofing of a financial service provider violate baseline digital trust expectations.

  - 339. See Timeline, July 5–July 9, 2024; Exhibits 31, 43, 47.

### b. Immoral or Unethical Conduct

- 340. Kraken silently patched the web form after Plaintiff's testing and critique without informing impacted users or regulators (Exhibit 47).

- 341. Concealed the spoofing mechanism even after knowing it enabled impersonation of Kraken employees (Exhibits 3, 31, 43).

- 342. Failed to release confirmation emails that could help identify the scammer (Exhibits 15, 16, 55).

  - 343. See Timeline, May–July 2024.

## c. Substantial Injury to Consumers

- 344. Plaintiff lost over $200,000 in assets.

- 345. Kraken's failure to act or notify consumers about this form left other users exposed to similar attacks.

- 346. The phishing exploit did not require a Kraken account or hacking credentials—just the use of a publicly available form.

  - 347. See Timeline, May 2; Exhibits 3, 8, 26–28, 31, 43, 44.

## C. STANDING (Lanham Act + CUTPA)

- 348. Injury-in-Fact: Theft of 15,011 ICP tokens valued at ~$200,000.

- 349. Causation: Directly resulted from reliance on Kraken's false advertising and omissions.

- 350. Redressability: Statutory and equitable relief available under both federal and state law.

**SUPPORTING CASE LAW**

- 351. In re Equifax, 362 F. Supp. 3d 1295 (N.D. Ga. 2019): False data protection representations supported both Lanham Act and consumer fraud claims.

- 352. Matsumura v. Benihana, 542 F. Supp. 2d 245 (S.D.N.Y. 2008): Corporate silence on known vulnerabilities constitutes fraudulent omission.

- 353. Bridgestone/Firestone v. Recovery Credit Servs., 98 F.3d 13 (2d Cir. 1996): Misrepresentations with intent to induce trust are actionable under consumer protection laws.

## COUNT V: VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)

**Jurisdiction**: Federal jurisdiction is proper under 28 U.S.C. § 1331.

354. Plaintiff repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**Overview**:

Kraken negligently operated an insecure public-facing support form that enabled a third-party attacker to bypass account protections and extract sensitive data under false pretenses. This attack resulted in the unauthorized access and manipulation of Plaintiff's Kraken account, the withdrawal of digital assets, and over $200,000 in damages. The conduct constitutes a violation of the Computer Fraud and Abuse

Act ("CFAA"), which prohibits unauthorized access—or access exceeding

authorization—of protected computers used in interstate commerce.

## ELEMENTS OF CFAA VIOLATION

### 1. Access to a Protected Computer Without Authorization or in Excess Thereof (§ 1030(a)(2))

- 355. Kraken's systems, including its support form and customer accounts, are connected to the internet and operate in interstate commerce, qualifying as "protected computers" under § 1030(e)(2)(B).

- 356. On May 2, 2024, the attacker:

  - 357. Used Kraken's support form to send a spoofed email from support@kraken.com (Exhibits 3, 8, 31),

  - 358. Impersonated a Kraken employee ("Sebastian") during a phone call (Exhibit 9),

  - 359. Directed Plaintiff to a phishing site that mimicked Kraken's site and accepted credentials (Exhibits 10, 11),

  - 360. Bypassed Plaintiff's two-factor authentication and created multiple withdrawal addresses inside Plaintiff's Kraken account.

    - 361. Plaintiff never received the required Kraken confirmation emails for address creation, violating Kraken's protocols (Exhibits 15, 16, 55).

- 362. The confirmation emails were either intercepted or sent to a different Kraken account—suggesting misuse of elevated (possibly admin-level) access.

- 363. See Timeline, May 2, 2024 incident.

364. This activity exceeded any authorization the scammer may have had—either by impersonating Kraken support to gain credentials or by misusing a second account to manipulate Plaintiff's.

**2. Intent to Defraud and Obtain Value (§ 1030(a)(4))**

- 365. The scammer knowingly and intentionally deceived Plaintiff into surrendering access credentials to the NNS wallet by:

  - 366. Posing as a Kraken employee during a two-hour phishing call (Exhibit 9),

  - 367. Using Kraken's own infrastructure to impersonate official support (Exhibit 8),

  - 368. Creating an artificial sense of urgency about hackers withdrawing ICP tokens,

  - 369. Guiding Plaintiff to a fake site to input seed phrase information (Exhibit 11).

370. This deceit resulted in unauthorized access to Plaintiff's Kraken account and downstream control of his Dfinity Internet ID, enabling the theft of 15,011 ICP tokens (~$200,000) (Exhibits 12, 24, 25).

- 371. See Timeline, May 2 incident and aftermath.

## 3. Damage and Loss (§ 1030(a)(5)(B)–(C))

- 372. Financial loss: 15,011 ICP tokens, valued at ~$200,000 (Exhibit 12).

- 373. Further costs:

  - 374. Forensic investigation, legal research, documentation, and independent testing of Kraken's support form (Exhibits 3, 31, 43, 44, 60).

  - 375. Months of legal preparation and communications with Kraken and law enforcement (Exhibits 26–28, 31, 65).

  - 376. These losses easily exceed the CFAA's $5,000 threshold (18 U.S.C. § 1030(c)(4)(A)(i)(I)).

## 4. Standing (§ 1030(g))

377. Plaintiff satisfies the private right of action requirements under § 1030(g):

- 378. Injury-in-fact: Over $200,000 in cryptocurrency stolen.

- 379. Causation: Resulted from Kraken's infrastructure enabling impersonation and unauthorized access.

- 380. Redressability: Judicial relief under CFAA permits compensatory and statutory damages, as well as equitable remedies.

## SUPPORTING EXHIBITS AND TIMELINE EVENTS

- 381. Support Form Design and Exploit: Exhibits 3, 8, 31, 60; see Timeline (before May 2, May 2, July 5–9, 2024)

- 382. Account Manipulation / Withdrawal Address Creation: Exhibits 15, 16, 55; see Timeline, May 2

- 383. Plaintiff's Immediate Reports and Kraken's Delay: Exhibits 26–28

- 384. Scammer's Deception and Phishing Scheme: Exhibits 9–11

- 385. Lost Assets and Wallet Control: Exhibits 12, 24, 25

- 386. Investigation and Law Enforcement Involvement: Exhibits 43, 44

## SUPPORTING CASE LAW

- 387. Van Buren v. United States, 593 U.S. 374 (2021): Exceeding authorized access includes retrieving or manipulating data that one has no right to control.

- 388. Int'l Airport Ctrs., L.L.C. v. Citrin, 440 F.3d 418 (7th Cir. 2006): Unauthorized internal misuse of systems qualifies under CFAA.

- 389. HiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180 (9th Cir. 2022): Public-facing infrastructure accessed for unauthorized purposes can trigger CFAA liability.

**HARM TO PLAINTIFF**

(With Supporting Timeline Facts and Exhibits)

390. As a direct and proximate result of Defendant's actions and inactions, Plaintiff suffered substantial economic and non-economic harm, including:

**A. Economic Damages**

1. 391. Loss of Digital Assets

   - 392. Theft of 15,011 ICP tokens, valued at approximately $200,000 at the time of the incident.

     - 393. See Timeline, May 2, 2024; Exhibits 12 (price), 24 (ICP dashboard), 25 (NNS neurons).

2. 394. Post-Incident Financial Losses

   - 395. Costs associated with pursuing asset recovery and understanding the attack:

     - 396. Time and effort spent contacting Kraken and law enforcement with detailed incident reports (Exhibits 26–28, 43, 44).

     - 397. Extensive documentation and legal research to determine the source and mechanism of the breach (Exhibits 31, 65).

     - 398. Personal testing of the Kraken support form, including blind tests with Investigator Stempien (Exhibits 3, 44, 60).

     - 399. See Timeline, May–December 2024 and July 5–13 (form discovery and legal outreach).

3. 400. Opportunity Cost and Lost Time

- 401. For nearly a year following the incident, Plaintiff devoted significant time to investigating the vulnerability and preparing this action.

  - 402. See Timeline, Late 2024–Early 2025.

---

## B. Non-Economic Damages

1. 403. Severe Emotional Distress and Anxiety

   - 404. Plaintiff experienced acute psychological distress due to the loss of high-value assets, fear of further identity exploitation, and the gaslighting by Kraken support.

     - 405. See Timeline, May 2–May 19, 2024; Exhibits 26–28 (initial reports and unhelpful Kraken responses).

2. 406. Loss of Trust in Financial Institutions

   - 407. Plaintiff reasonably relied on Kraken's security representations. The phishing incident and Kraken's refusal to take accountability destroyed that trust.

     - 408. See Exhibits 34–37, 39, 41, 52–55 (public security claims), and Exhibits 31, 43, 47 (admission and silent remediation).

3. 409. Ongoing Harm from Kraken's Refusal to Remedy the Situation

   - 410. Kraken failed to explain the breach, assist with recovery, or acknowledge the systemic design flaw until forced to by Plaintiff's persistent inquiry.

     - 411. See Exhibit 31 (Clarkson admission), Exhibit 47 (form silently modified), Exhibit 65 (ignored settlement outreach).

     - 412. See Timeline, July and December 2024.

## CONCLUSION ON HARM

413. Given Kraken's security failures and post-incident neglect, Plaintiff has suffered harm of a scale and seriousness warranting:

- 414. Actual and compensatory damages for lost assets and investigation costs,

- 415. Punitive damages for recklessness and deceit,
- 416. Non-economic damages for emotional trauma and loss of digital autonomy.

## PRAYER FOR RELIEF REQUESTED

417. Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

1. 418. Compensatory Damages

   For the full value of the stolen digital assets—15,011 ICP tokens—at the time of loss, including any appreciated value, in an amount exceeding $200,000, plus interest. If the price of the total amount of 15,011 goes up by the date of trial, then the amount awarded would appreciate by that same amount.

2. 419. Punitive Damages

   In an amount sufficient to punish and deter Defendants for gross negligence, fraudulent misrepresentation, reckless indifference to user safety, and systemic concealment of a known security vulnerability.

3. 420. Treble Damages

   As permitted under the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110g, for willful or knowing violations of consumer protection law.

4. 421. Non-Economic Damages

   For emotional distress, mental anguish, and loss of time over the course of

a year, productivity, and peace of mind resulting from Defendants' conduct

and Plaintiff's exhaustive investigation into the incident.

5. 422. Injunctive Relief

a. Requiring Defendants to publicly disclose the prior vulnerability of their

support form and the scope of its abuse.

b. Mandating future transparency regarding material security flaws

affecting communications from Kraken or its platforms.

c. Enjoining further deceptive advertising or representations of security

compliance unless independently verified and currently upheld.

6. 423. Declaratory Relief

Declaring that Defendants' arbitration clause is unenforceable with respect

to the claims in this action.

7. 424. Attorneys' Fees and Costs

To the extent permitted by law, including under CUTPA and 15 U.S.C. §

1117(a), even though Plaintiff proceeds pro se.

8. 425. Prejudgment and Postjudgment Interest

On all monetary awards as allowed by law.

9. 426. Such other and further relief as this Court deems just and proper

under the circumstances.

10. 427. Personal Data protection Lifetime subscription to a personal data

(e.g.- social security number) protection service.

**11.** 428. Grant a bench trial on all issues so triable, as Plaintiff waives the right to
a jury trial.

**CERTIFICATE OF SERVICE**

**429. I hereby certify that, in the week of 4-21-25, Plaintiff will serve a copy of
the foregoing Third Amended Complaint along with Summons, attachments,
and other Court documents via CT State Marshall upon:**

**430. C T Corporation**

**Registered Agent for Payward Interactive, Inc.**

**357 East Center Street, Ste. 2 J, Manchester, CT 06040**

**431. WHEREFORE,** Plaintiff respectfully requests that the Court accept this
First Amended Complaint as properly filed and proceed accordingly.

432. Dated: 4-17-25

433. Respectfully submitted,

434. Geoffrey Jacobs

435. Plaintiff, Pro Se

436. 85 Lindale St Unit 1

437. Stamford, CT  06902

438. 203-537-9449

439. geoff@effincomputers.com\

**Appendix A**

| Exhibit Name | Exhibit Description |
|---|---|
| **Exhibit 3** | Screenshot of test of Kraken's public "Sign-in troubleshooting & Account security" web form in the design that had many vulnerabilities. And the email generated from it, received from it on an email account not connected with a Kraken account. |
| **Exhibit 5** | Bare PDF file- Kraken's Terms of Service, as downloaded by Plaintiff from www.kraken.com on September 20, 2024. Text involving a binding agreement is white, invisible,and unreadable. Attached as bare file to exhibit invisible text. |
| **Exhibit 6** | Kraken's Terms of Service (page 2 and 20 referenced); Page 2 states the terms govern the Kraken subscriber's use of Kraken's website and services, Page 20 specifies arbitration clause timing and limitations. From later date than version of terms of service in Exhibits 5 and 7). |
| **Exhibit 7** | Informational page showing the invisible text from Exhibit 5, screenshot how Plaintiff found it. This is followed by the Terms of Service file downloaded from www.kraken.com |
| **Exhibit 8** | Phishing email received by the Plaintiff when the phishing attack was commenced. |
| **Exhibit 9** | Screenshot of Plaintiff's cell phone call log from May 2, 2024, showing that the scammer called him from the phone number 505-596-1787. |
| **Exhibit 10** | Screenshot of text from scammer instructing Plaintiff to go to a certain web site that looked like Kraken's website. |
| **Exhibit 11** | Screenshot showing that site (referred to in Exhibit 10) that accepted Plaintiff's Kraken credentials. |
| **Exhibit 12** | Evidence of ICP token price on May 2, 2024. |
| **Exhibit 14** | Example of legitimate Kraken confirmation emails previously received by Plaintiff. Email confirmed withdrawal address creation. |
| **Exhibit 15** | Kraken documentation – how to create a withdrawal address. Step 8- "You will receive request to verify the newly added withdrawal address." |
| **Exhibit 16** | Confirmation emails received by Plaintiff for his deletion of fraudulent addresses created by scammer; no corresponding confirmations had been received for creation of these addresses. |
| **Exhibit 19** | Email. Received from Dfinity support, confirming activity on neurons consistent with theft of Plaintiff's Dfinity Internet ID and wallets of his Internet ID. May 7, 2024, 10:46 EDT |

71

| | |
|---|---|
| **Exhibit 20** | Dfinity's response confirming wallet alteration and inability to freeze/reverse. Email from Dfinity support. Confirming that Dfinity cannot recover the ID or assets for Plaintiff.  May 7, 2024, 10:46 EDT |
| **Exhibit 21** | Screenshot of the Kraken ledger upon Plaintiff's withdrawal of the of 15,011 ICP tokens on 4/19/24 |
| **Exhibit 23** | Evidence of ICP sent from Ledger Live to NNS (Dfinity's system). |
| **Exhibit 24** | ICP Dashboard showing Plaintiff's ICP holdings. |
| **Exhibit 25** | Screenshot of Plaintiff's 2 ICP NNS Neurons (wallets). |
| **Exhibit 26** | Email. Plaintiff's first report of the incident to Kraken. Fri, May 3, 2024 at 12:05 AM |
| **Exhibit 27** | Emails. Plaintiff communicating with Kraken support representative. Asking how he was robbed. Sat, May 11, 2024 at 6:40 PM Kraken support response avoiding direct explanation, focused on account restoration. |
| **Exhibit 28** | Emails. Series of emails to and from Kraken, beginning at Sun, May 19, 2024 at 6:26 PM Follow-up support correspondence with Kraken. |
| **Exhibit 31** | Email exchange with Daniel Clarkson (Kraken Legal), confirming scammer used Kraken's web form "Sign-in troubleshooting & Account security" to manipulate Plaintiff. |
| **Exhibit 32** | Article: Top 5 cybersecurity threats legal teams face today \| Thomson Reuters. |
| **Exhibit 34** | Kraken promotional material claiming 'Industry-leading security'.Kraken promotional material claiming 'Industry-leading security'. "Industry leading security protects your investments". "Protecting your funds and privacy is our number one objective". |
| **Exhibit 35** | Kraken promotional material claiming- "Kraken celebrates excellence in Cybersecurity with a new accreditation" ISO 27001 Certification Announcement. |
| **Exhibit 36** | Kraken promotional material- "What does Kraken do to secure my personal information?" Kraken documentation on user data protection. |
| **Exhibit 37** | Kraken promotional material- "Kraken completes SOC 2, Type 1 for custody and funding services". |
| **Exhibit 39** | Kraken promotional material- "Security above everything: why every month is Cybersecurity Awareness Month at Kraken". |
| **Exhibit 40** | Kraken Documentation- "Bug Bounty Get Bitcoin for finding security bugs". |
| **Exhibit 41** | Kraken documentation on client security management. |
| **Exhibit 43** | Email from Investigator Stempien identifying Kraken's web form "Sign-in troubleshooting & Account security" as enabling phishing and social engineering. |

| | |
|---|---|
| **Exhibit 44** | Email sent to Investigator Stempien from Plaintiff entering his email address into web form. Email was forwarded to Plaintiff by Investigator Stempien at a later time. |
| **Exhibit 47** | Kraken- Support "Sign-in troubleshooting & Account security" Modified Kraken web form, much more secure than it was on May 2, 2024. Changes were post phishing attack on May 2, 2024. Fixes were made silently by Kraken. No public announcement. |
| **Exhibit 52** | Kraken Documentation- "How to differentiate a Kraken email from a phishing email" "Emails from Kraken will always have the @kraken.com domain name at the end of them.". Kraken claim that emails from support@kraken.com are inherently secure. |
| **Exhibit 53** | Kraken Documentation- "How to differentiate a Kraken email from a phishing email" "Secure emails from Kraken include:". Emails from support@kraken.com are inherently secure. |
| **Exhibit 54** | Kraken description of phishing emails and how to recognize them.  Kraken's own definition of phishing. |
| **Exhibit 55** | Kraken Documentation – Policy documentation confirming that email confirmations are required for new withdrawal addresses. "We will notify you anytime the following actions are attempted on your account" "Adding or updating withdrawal addresses". |
| **Exhibit 59** | Emails to and from Kraken support and Plaintiff between 5-24-24 and 6-6-24. |
| **Exhibit 60** | Email received after Plaintiff learned of Kraken's web for "Sign-in troubleshooting & Account security" and tested it out himself. Email was produced by web form. |
| **Exhibit 62** | Email Header from email sent by Kraken Support. |
| **Exhibit 63** | Email Header from Plaintiff Email- Testing Form. |
| **Exhibit 64** | Email header of scammer's phishing email. Email Header from Scammer Email, generated by the Kraken web form on May 2, 2024. |
| **Exhibit 65** | Email Plaintiff sent to Kraken's legal team summarizing his position and offer to settle for just the restoration of the 15,011 ICP tokens that were lost. Sent on 12-17-24 |
| **Exhibit 66** | List of NIST Special Publication 800-177 Revision 1 violations, a cross reference of their corresponding pages of mention in the NIST Special Publication 800-177 Revision 1, a summary explanation of each violation, and the NIST Special Publication 800-177 Revision 1 document. |
| **Exhibit 67** | List of ISO/IEC 27001 violations, the corresponding Annex or Clause, relevant section description, the corresponding page within the ISO/IEC 27001 document, and the ISO/IEC 27001 document. |
| **Exhibit 68** | List of SOC 2 Type I violations, the corresponding violated |

73

Trusted Service Criteria, description, page citation from "2017 Trust Services Criteria (With Revised Points of Focus – 2022)" document, and the "2017 Trust Services Criteria (With Revised Points of Focus – 2022)" document.

**Appendix B- Glossary**

**Glossary of Legal and Technical Terms**

440. DMARC: Domain-based Message Authentication, Reporting & Conformance – a protocol that protects against email spoofing.

441. Dfinity: The organization that developed the Internet Computer Protocol (ICP), a blockchain-based project.

442. Email Spoofing: A cyberattack technique where a sender forges the "From" address in an email to impersonate someone else.

443. Gilmer v. Interstate/Johnson Lane Corp.: A Supreme Court case holding that statutory claims can be subject to arbitration under certain conditions. But held that arbitration is not enforceable where it would undermine substantive rights or public policy protected by statute.

444. ISO/IEC 27001: An international standard outlining best practices for information security management.

445. Kraken: A cryptocurrency exchange platform operated by Payward, Inc. and Payward Ventures, Inc.

446. Lanham Act: A federal law that prohibits false advertising and trademark infringement.

447. NIST SP 800-177r1: A National Institute of Standards and Technology publication providing email security guidelines.

448. NNS (Network Nervous System): A component of the Dfinity project used to manage governance of the ICP blockchain.

449. Neuron -Dfinity NNS Neuron: ICP tokens are staked in a neuron. Each neuron has a neuron ID, which is an identity selected by the NNS when the neuron is created. In addition, each neuron has an associated account on the ICP ledger where the locked ICP balance resides.

450. Payward Ventures, Inc.: Another legal entity affiliated with the Kraken exchange.

451. Payward, Inc.: One of the parent companies operating Kraken, a digital asset exchange.

452. Phishing: A type of cyberattack where attackers impersonate a legitimate entity to steal sensitive information.

453. SOC 2: A security framework that evaluates how a service provider handles customer data based on five "trust service criteria."

454. Seed Phrase: A series of words used to access a cryptocurrency wallet; losing it would mean losing access to digital assets.

455. Spoofing: Deceiving a system or person by impersonating another entity, often used in phishing attacks.

456. Two-Factor Authentication (2FA): A security process requiring two types of identification to access an account.

457. Withdrawal Address: A designated location where cryptocurrency can be transferred from an exchange account. The cryptocurrency would be sent to that address and no longer be present in the account it was sent from.

Geoffry Jacobs

4-17-25