**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GEOFFREY JACOBS, | ) | 3:25-CV-567 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAYWARD, INC., et al., | ) | |
| *Defendants*. | ) | March 30, 2026 |

**RULING AND ORDER ON DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**
**AND PLAINTIFF'S MOTION FOR A JUDICIAL DETERMINATION**

Sarala V. Nagala, United States District Judge.

Plaintiff Geoffrey Jacobs brings this action *pro se* against Defendants Payward, Inc., Payward Ventures, Inc., and Payward Interactive, Inc. (together, "Kraken") alleging state law claims for negligence, gross negligence, and common law fraud; violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b, *et seq*.; violation of the Lanham Act, 15 U.S.C. § 1125(a); and violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq*. Plaintiff alleges that he was the victim of an online phishing attack where hackers impersonated Kraken employees and contacted him through a company email address, resulting in his ultimately losing approximately $200,000 of digital assets. Plaintiff further alleges that Kraken falsely represented the security measures it had in place, inducing Plaintiff to create an account with them.

Kraken has filed a motion to compel arbitration and to stay proceedings pending the results of such arbitration, arguing that Plaintiff's claims arise out of and are subject to the parties' valid and enforceable arbitration clause. Plaintiff, for his part, opposes Kraken's motion and has also filed a motion for judicial determination seeking a declaratory judgment that the arbitration clause

is invalid.  For the reasons set forth below, the Court GRANTS Kraken's motion to compel arbitration and DENIES Plaintiff's motion for judicial determination.

## I.    FACTUAL BACKGROUND

In deciding a motion to compel arbitration, the Court considers "all relevant, admissible evidence submitted by the parties."  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019).  Unless otherwise noted, the parties do not dispute the following facts for the purpose of this motion.

### A.  Phishing Scam

Kraken operates an online exchange platform that "allows users to buy, trade, and sell cryptocurrencies."  Mot. to Compel, ECF No. 45 at 7.  Plaintiff created a Kraken account in February of 2021 and has since "entrusted over $200,000 in digital assets to Kraken."  *Id.* at 8 (citing Davie Decl., ECF No. 46 ¶ 9); Fourth Am. Compl., ECF No. 32 ¶ 1.  On May 2, 2024, Plaintiff received a phone call from a "Sebastian from Kraken Support."  ECF No. 32 ¶ 70.[1]  Soon after, Plaintiff received an email from "support@kraken.com," with the signature "Sebastian," that was generated from a public "Sign-in troubleshooting & Account security" web form controlled by Kraken.  *Id.* ¶¶ 9, 71.  This email also contained a support ticket generated by the web form to notify individuals of any account issues.  *Id.* ¶ 71.  Plaintiff alleges that the web form "lacked basic sender or recipient verification" and did not require the submitting party to have a Kraken account. *Id.* ¶ 45.

Concurrently, on the phone, Sebastian read Plaintiff's full social security number and driver's license number to him and told Plaintiff that hackers had infiltrated Plaintiff's Kraken

---

[1] Plaintiff's paragraph numbering system in his fourth amendment complaint is inconsistent, with certain paragraphs having two paragraph numbers associated with them.  *See e.g.*, ECF No. 32 at 20 (paragraph beginning with "The vulnerabilities of this form," numbered both 18 and 69).  For purposes of this ruling, where there are two paragraph numbers provided for the same paragraph, the Court cites to the higher of the two numbers.

account and were attempting to withdraw the 15,000 ICP tokens he had in his online wallet. *Id.* ¶¶ 74–76. Sebastian then provided Plaintiff with a link to a website, resembling Kraken's website, where if he provided his electronic wallet information, Sebastian could apparently disconnect Plaintiff's electronic wallet and allegedly protect his ICP tokens. *Id*. ¶¶ 80–86. Plaintiff did this and, as a result, his tokens were "lost." *Id*. ¶ 86.

On May 3, 2024, Plaintiff reported the phishing incident to Kraken when he realized he no longer could log in to the website that creates and manages his ICP tokens. *Id.* ¶ 99. As of May 19, 2024, Kraken continued to attempt to restore Plaintiff's account while also suggesting Plaintiff contact law enforcement, which he did. *Id.* ¶¶ 110–13. Plaintiff has continued to investigate this hacking incident "every day since it occurred." *Id.* ¶ 115.

B. Arbitration Agreement

To create a Kraken account, a user must first agree to Kraken's Terms of Service. ECF No. 45 at 7. The user does so by navigating to the "Create Your Account" page and checking a box that is associated with text stating: "By continuing I agree to the Terms and Service and Privacy Policy." ECF No. 45 at 8. Both the phrases "Terms and Service" and "Privacy Policy" are in purple font and hyperlinked. *Id.* Once a user checks the box, a "Create account" button changes from grey to dark purple and can be selected. *Id.*



ECF No. 45 at 8.

Kraken's Terms of Service state at the top in all capital letters "BY CLICKING THE 'CREATE ACCOUNT' BUTTON OR BY ACCESSING OR USING THE SERVICES, YOU AGREE TO BE LEGALLY BOUND BY THESE TERMS OF SERVICE AND ALLL TERMS INCORPROATED BY REFERENCE." Terms of Service, ECF No. 46-2 at 2. Section 23 of the Terms of Service sets forth the arbitration clause. The top of the arbitration clause reads in all capital letters "PLEASE READ THE FOLLOWING PARAGRAPH CAREFULLY BECAUSE IT REQUIRES YOU TO ARBITRATE DISPUTES WITH US AND IT LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF." *Id.* at 21. The arbitration clause contains a delegation provision, whereby the parties "agree to arbitrate any dispute arising from these Terms or [] use of the Services, except for disputes . . . for the alleged unlawful use of copyrights, trademarks, trade names, trade secrets or patents." *Id.* Further, any arbitration "will be conducted confidentially by a single arbitrator in accordance with the rules of JAMS." *Id.*

4

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Section 2 of the FAA provides in relevant part that:

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 4 of the FAA in turn enables any "party aggrieved" by the failure of another to arbitrate under a written agreement for arbitration to petition a United States District Court "for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* § 4.

The Second Circuit has developed a two-part test to determine whether claims are subject to arbitration, considering "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022). This does not require a showing that the agreement would be enforceable; instead, the moving party must simply show that an agreement existed. *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022). "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to show the agreement to be inapplicable or invalid." *Zachman*, 49 F.4th at 102 (cleaned up; citation omitted). "If the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," courts "may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* at 101

(quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)); *see also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011). Where "there is an issue of fact as to the making of the agreement for arbitration," however, "then . . . a trial is necessary." *Zachman*, 49 F.4th at 101; 9 U.S.C. § 4.

"[A]greement-formation questions" are determined "by applying the law of the state at issue[.]" *Barrows*, 36 F.4th at 50. "A court may not deny arbitration where there is a valid arbitration agreement that covers the asserted claims." *Davis v. Macy's Retail Holdings, Inc.*, No. 3:17-CV-1807 (JBA), 2018 WL 4516668, at *2 (D. Conn. Sept. 19, 2018) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration.")).

### III.    DISCUSSION

#### A.    Choice of Law

As a threshold matter, the Court applies California law to determine whether a valid agreement to arbitrate was formed between the parties, as both sides suggest that state's law should apply to that analysis. *See* ECF No. 45 at 14–15 (noting that the Terms of Service contain explicit California choice of forum and choice of law clauses and Kraken, the contract's drafter, is located in California); Pl.'s Opp'n to Mot. to Enforce, ECF No. 49 at 3 (invoking California law). Even if the parties did dispute what state's law should apply, though, the Second Circuit has noted that "traditional contract formation law does not vary meaningfully from state to state." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702–03 (2d Cir. 2023).

"Under California law, the basis of a lawfully formed contract is 'a manifestation of mutual assent.'" *Soliman v. Subway Franchisee Advert. Fund Trust, Ltd.*, 999 F.3d 828, 834 (2d Cir. 2021) (quoting *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999)); *Singh v. Payward,*

6

*Inc.*, No. 23-CV-01435 (CRB), 2023 WL 5420943, at \*4 (N.D. Cal. Aug. 22, 2023).  Interpreting California law, the Second Circuit has noted that mutual assent is an objective standard.  *Meyer,* 868 F.3d at 74; *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

    B.  Contract Formation

When the question of whether an agreement to arbitrate was formed at all, rather than such agreement's validity, is raised, the Court must answer this question before proceeding to analyze the agreement's validity.  *See Dr.'s Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 252 (2d Cir. 2019).  Plaintiff's operative complaint is a muddled mess of conflicting statements, appearing to argue both that there is no formed contract *and* that the Terms of Service were assented to, but should not be enforced against him.  *See* ECF No. 32 at 8 ("Lack of Assent Due to Third-Party Use"), 10 ("Consent to the arbitration clause was obtained under [] false pretenses, invalidating the agreement"); ECF No. 49 at 3 (*compare* "This is not a challenge to performance or breach—it is a challenge to whether mutual assent ever occurred" *with* "fraudulent inducement, material breach, and procedural unconscionability are valid defenses to contract enforcement"), 6 ("no agreement to arbitrate this particular claim exists here").  Nevertheless, parsing through these statements, the Court concludes a contract has been formed.

Whether there is an agreement to arbitrate is a matter of contract and should be analyzed as such.  *Soliman*, 999 F.3d at 834; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  "[T]hreshold questions concerning contract *formation*" are distinct "from questions concerning enforceability and scope" of a fully formed agreement.  *Dr.'s Assocs., Inc.*, 934 F.3d at 251 (emphasis in original).  The former is an issue "that a court must decide," and cannot delegate to an arbitrator.  *Id.* at 251–52 ("parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place").

Plaintiff's argument against contract formation is that his alleged harm "arose from a scammer's misuse—not from Plaintiff's use—of Kraken's support infrastructure," and because this "misuse wasn't initiated through normal usage," there was "no assent" and therefore no contract. ECF No. 32 ¶¶ 9–10. But how and why the scammer used Kraken's platform is not at issue; the question is whether *Plaintiff* formed a contract with Kraken to arbitrate the present dispute. Kraken has placed into the record evidence that Plaintiff registered for an account and manifested his assent to the Terms of Service on February 27, 2021, well before the alleged phishing incident that occurred in May of 2024. ECF No. 46 ¶ 9. At no point does Plaintiff challenge the accuracy of Kraken's statement; quite the contrary—the fourth amended complaint seems to support it. *See* ECF No. 32 ¶ 42 (Plaintiff "was a registered user of Kraken's platform at all times relevant to this Complaint"). Further, Plaintiff takes no issue with the "clickwrap" method of manifesting assent, labeling it a "superficial" issue. ECF No. 49 at 3.

Plaintiff's contention that the Terms of Service he previously manifested assent to do not apply because a third-party masquerading as Kraken, not Kraken itself, reached out to him misunderstands the applicable standard. Plaintiff has formed an agreement with Kraken—the Terms of Service. Despite his characterization of his arguments, he does not actually challenge this.[2] Whether those terms are *valid* and mandate arbitration of this particular issue—the true heart of Plaintiff's challenge—is an entirely separate question of contract validity and one that presupposes the existence of a contract. Accordingly, because there is unrefuted evidence that

---

[2] At times, Plaintiff characterizes his fraudulent inducement argument as one that goes to the question of contract formation, not validity. *See e.g.*, ECF No. 49 at 3 ("Lack of Mutual Assent Due to Fraudulent Inducement"). But regardless of how he characterizes it, Plaintiff's fraudulent inducement argument is directed at the enforceability of the arbitration agreement. Accordingly, to the extent Plaintiff refers to his fraudulent inducement claim as going to the existence of a contract, this is incorrect. Plaintiff's enforceability arguments are addressed below.

Plaintiff manifested assent to the Terms, and Plaintiff does not challenge the validity of the assent mechanism, Plaintiff has not properly challenged contract formation.

    C.  <u>Valid Agreement to Arbitrate</u>

Having determined a contract was formed, the Court turns to the validity of the Terms of Service. The main thrust of Plaintiff's opposition is that the Terms of Service's arbitration clause is unenforceable and that this Court must adjudicate his dispute. ECF No. 32 at 8–14. Because the arbitration clause is valid and enforceable, the Court rejects Plaintiff's arguments.

Section 2 of the FAA reflects a liberal federal policy favoring arbitration. *Soliman,* 999 F.3d at 834. "[P]arties can agree to arbitrate gateway issues of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). To delegate these issues, there must be "*clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (emphasis in the original) (internal citation omitted); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

Section 2 contemplates two types of validity challenges: "[o]ne type challenges specifically the validity of the agreement to arbitrate," and "[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). "[O]nly the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." *Rent-A-Center*, 561 U.S. at 70. Defenses aimed at the validity of the contract in its entirety "should . . . be considered by an arbitrator," not the courts. *Preston*,

552 U.S. at 351; *Buckeye*, 546 U.S. at 444; *Rent-A-Center*, 561 U.S. at 70 ("a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate"); *Hickey v. Smith*, No. 1:23-CV-2538 (MKV), 2025 WL 692052, at *8 (S.D.N.Y. Mar. 3, 2025) ("[a] valid claim that a Plaintiff was fraudulently induced to sign a contract including an arbitration provision 'does not prevent a court from enforcing a specific agreement to arbitrate.'" (quoting *Rent-A-Center*, 561 U.S. at 70)).

But where the challenge is "'fraud in the inducement of the arbitration clause itself,' then the court would [consider] it." *Rent-A-Center*, 561 U.S. at 71 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967)); *Rosenthal v. Great Western Fin. Sec. Corp.*, 14 Cal.4th 394, 416–17 (1996). "[W]here the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract[, courts] nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene." *Rent-A-Center*, 561 U.S. at 71; *Hook v. UBS Fin. Servs., Inc.*, No. 3:10-CV-950 (JBA), 2011 WL 1741997, at *3 (D. Conn. May 4, 2011) (declining to consider validity of the arbitration agreement where plaintiff did not "differentiate between the arbitration provision and the [agreement] as a whole, claiming that fraud induced the whole contract equally" (cleaned up)).

Plaintiff has set forth five distinct arguments for why the arbitration clause of the Terms of Service is invalid and unenforceable:  (1) lack of assent due to third party use; (2) fraudulent inducement; (3) procedural and substantive unconscionability; (4) public policy; and (5) breach of duty.  ECF No. 32 at 8–15.  Because Plaintiff's arguments are aimed specifically at the arbitration clause itself, rather than the Terms of Service as a whole, the Court analyzes whether any argument is sufficient to invalidate the arbitration clause.  *Rent-A-Center*, 561 U.S. at 70.  The Court concludes that none of Plaintiff's arguments are sufficient to invalidate the arbitration clause.

### 1. Lack of Assent

First, the Court rejects Plaintiff's argument that because his "harm arose from a scammer's misuse . . . of Kraken's support infrastructure . . . no assent to arbitration exists for this dispute." ECF No. 32 at 8–9.  As explained above, this is an issue of contract formation, not contract validity, which fails because Plaintiff does not dispute his assent to the Terms of Service generally; he only challenges whether the Terms of Service cover the incident at issue here.  Accordingly, the Court denies this argument to the extent it is asserted to invalidate the arbitration clause.

### 2. Fraudulent Inducement

Plaintiff's fraudulent inducement defense also fails, as he has not argued that the delegation provision of the arbitration clause itself was fraudulently induced, so the arbitrator must decide this question.

First, the Court holds that the arbitration clause at issue here delegated disputes over arbitrability to the arbitrator.  As noted above, parties may delegate issues of arbitrability to the arbitrator by use of clear and unmistakable language.  *Contec Corp.*, 398 F.3d at 208.  An arbitration clause that commits "any" or "all" disputes to arbitration necessarily includes disputes as to arbitrability and satisfies the "clear and unmistakable" intent requirement.  *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (noting that such language is "inclusive, categorical, unconditional, and unlimited").  Additionally, when parties "explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Contec Corp.*, 398 F.3d at 208; *see also Wells Fargo Advisors, LLC v. Sappington,* 884 F.3d 392, 396–98 (2d Cir. 2018).

Here, the Terms of Service require the parties to "arbitrate *any dispute* arising from these Terms or [Plaintiff's] use of the Services," except for disputes not relevant here.  ECF No. 46-2 at

21 (emphasis added). They also provide that arbitration will be conducted "in accordance with the rules of JAMS." *Id.*[3] Thus, the Court concludes that the arbitration clause contains a "valid provision specifically committing . . . disputes [over arbitrability] to an arbitrator." *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 299 (2010).

To challenge the delegation of arbitrability issues to an arbitrator, a plaintiff must not merely allege that the arbitration clause, as a whole, was fraudulently induced; he must also specifically challenge the validity of the *delegation provision* of an arbitration clause. *Dr.'s Assocs., Inc. v. Alemayehu*, No. 18-CV-276 (JCH), 2020 WL 13538883, at *5 (D. Conn. May 29, 2020) ("Because [plaintiff's] fraudulent inducement argument applies to the arbitration clause as a whole, rather than the delegation provision in particular, it is not sufficiently specific to avoid arbitration under *Rent-A-Center*.").

Here, while Plaintiff's argument is directed at the arbitration clause generally, he has not alleged any facts that suggest a basis to invalidate the delegation provision specifically. *See id.* at *3. Plaintiff alleges that Kraken "advertised compliance with SOC 2, ISO 27001, and robust email protections," which "influenced Plaintiff to trust" communications from Kraken and meant that his "[c]onsent to the *arbitration clause* was obtained under these false pretenses." ECF No. 32 at 9–10 (emphasis added). At no point, however, does Plaintiff argue he was fraudulently induced to accept the delegation provision of the arbitration clause. Accordingly, the arbitrator must decide the issue of fraudulent inducement. *See Dr.'s Assocs., Inc.*, 2020 WL 13538883, at *5; *Guerrero v. GoPuff*, No. 24-CV-6727 (JHR) (GS), 2025 WL 3539105, at *14 (S.D.N.Y. Dec. 10, 2025)

---

[3] The JAMS Rules provide that "[j]urisdictional and arbitrability disputes, including disputes over formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to Arbitration, shall be submitted to and ruled on by the Arbitrator. Unless the relevant law requires otherwise, the Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." *See* JAMS Comprehensive Arbitration Rules & Procedures, Rule 11(b), available at https://www.jamsadr.com/rules-comprehensive-arbitration/ (last visited March 30, 2026).

12

(nowhere did plaintiffs "suggest that the *Delegation Clause* in particular was the product of fraud").

### 3.    *Procedural and Substantive Unconscionability*

Next, Plaintiff argues that "Kraken selectively enforces its Terms of Service against registered users," which "undermines the mutuality required for enforceable contract." ECF No. 32 ¶ 20. But this argument is clearly one against the validity of the Terms of Service as a whole, not just the arbitration clause and thus is a claim for the arbitrator—not this Court—to decide. *Prima Paint Corp.*, 388 U.S. at 406; *Rent-A-Center*, 561 U.S. at 70.

### 4.    *Public Policy and Breach of Duty*

Plaintiff's remaining two arguments are equally unpersuasive.

As to public policy, Plaintiff's citations do not support his argument. First, in *Gilmer v. Interstate/Johnson Lane Corp.*, the question presented was "whether a claim under the Age Discrimination in Employment Act of 1967 . . . can be subjected to compulsory arbitration pursuant to an arbitration agreement." 500 U.S. 20, 23 (1991). Here, Plaintiff alleges no claim under that statute. And in any event, *Gilmer* rejected a slew of public policy arguments against mandatory arbitration, rather than endorsing them. *Id.* at 30–33. Next, *Ragone v. Atlantic Video at Manhattan Center* discusses public policy in the context of an arbitration agreement acting "as a prospective waiver of a party's right to pursue statutory remedies," which is not alleged to be the case here. 595 F.3d 115, 125 (2d Cir. 2010) (internal citation omitted). Finally, neither *Murray v. UBS Sec., LLC*, No. 14-CV-927 (KPF), 2020 WL 7384722 (S.D.N.Y. Dec. 16, 2020) nor *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295 (N.D. Ga. 2019) discuss public policy considerations related to the enforcement of arbitration agreements. More generally, the Court cannot identify any public policy that the arbitration clause at issue here would violate. Accordingly, Plaintiff's unsupported public policy argument must fail.

13

As to Plaintiff's breach of contract argument, it is based on his misreading of the Terms of Service. Plaintiff argues that the Terms of Service "impose a 30-day deadline to initiate arbitration," but Kraken did not notify him of the details of the security breach until "more than two months after the incident . . . making compliance impossible." ECF No. 32 ¶ 39. But the Terms of Service require only that the parties "notify each other in writing of any dispute" within thirty days of the dispute arising—not that they must commence arbitration within thirty days. ECF No. 46-2 at 21. Accordingly, this argument also fails.

Because none of Plaintiff's arguments against the validity of the arbitration clause are persuasive, the Court finds that the parties have entered into a valid agreement to arbitrate.[4]

D. Within the Scope of the Arbitration Clause

Having determined that the parties entered into a valid agreement to arbitrate, the Court also concludes that the parties have delegated the question of whether Plaintiff's allegations fall within the scope of the arbitration agreement to the arbitrator, not this Court, to decide. As discussed above, the arbitration clause here requires that "any dispute arising from these Terms or [Plaintiff's] use of the Services" be committed to arbitration. ECF No. 46-2 at 21. To the extent there is any question about the scope of the clause, that issue is reserved for the arbitrator, for the reasons explained above (principally that Plaintiff does not challenge the delegation of such issues to the arbitrator). *See Singh*, 2023 WL 5420943, at *7, *9 (finding same with respect to the Terms of Service at issue here). Because the parties have entered into a valid arbitration agreement that

---

[4] On March 29, 2026, Plaintiff filed a notice of "disputed issues of material fact," reflected in the parties' briefing. ECF No. 81 at 1. The notice does not raise any new arguments, and Plaintiff confirms that the notice merely "identifies disputed factual issues reflected in the existing record." *Id.* at 3. Accordingly, Plaintiff's notice does not alter the Court's analysis.

14

commits the questions of arbitrability to the arbitrator, the Court grants Kraken's motion to compel arbitration.[5]

### E. Stay of Proceedings

Pursuant to 9 U.S.C. § 3, a district court "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration . . . *shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . .". (emphasis added); *see also Katz v. Cellco P'ship*, 794 F.3d 341, 345–47 (2d Cir. 2015).  Plaintiff's protestations notwithstanding, the Court further grants Kraken's request to stay these proceedings pending resolution of the arbitration.

## IV.    MOTION FOR JUDICIAL DETERMINATION

Also pending is Plaintiff's motion at ECF No. 23, filed preemptively before Kraken's motion to compel arbitration.  The motion seeks declaratory relief, asking this Court to declare "the arbitration clause in Kraken's Terms of Service invalid and unenforceable."  Pl.'s Mot. for Judicial Determination, ECF No. 23 at 14.  Plaintiff's motion asserts six grounds on which to invalidate the arbitration clause:  (1) Plaintiff's lack of assent; (2) fraudulent inducement; (3) procedural and substantive unconscionability; (4) public policy; (5) breach of contract; and (6) violation of CUTPA's "Cigarette Rule."  Pl.'s Mot. for Decl. Relief, ECF No. 23 at 2–3. Because Plaintiff's motion is procedurally improper, and regardless, raises no valid arguments, it is denied.

First, Plaintiff's motion is procedurally improper.  While not explicitly titled as such, Plaintiff's motion seeks a declaratory judgment but "such a motion is not cognizable."  *Blast All, Inc. v. Hamilton Specialty Ins. Co.*, No. 3:19-CV-1237 (JAM), 2020 WL 4586504, at *3, n.2 (D.

---

[5] Kraken has requested attorneys' fees and costs associated with the litigation of its motion to compel.  ECF No. 45 at 27.  But as Kraken has provided no caselaw in support of its request, the Court denies this request.

Conn. Aug. 10, 2020) (citing *Jankovic v. Int'l Crisis Grp.*, 181 F. Supp. 3d 13, 14–15 (D.D.C. 2014)); *see also* Fed. R. Civ. P. 57.  But, as "Plaintiff has already asserted this claim for declaratory relief in the operative complaint, the motion is essentially one for partial summary judgment." *Hernandez v. Office of Comm'r of Baseball*, No. 18-CV-9035 (JPO), 2019 WL 5593056, at *1 (S.D.N.Y. 2019); *see also* ECF No. 32 at 70.  Accordingly, the Court construes Plaintiff's motion as a motion for summary judgment.

Turning to the merits, Plaintiff's first five arguments are repetitive of the arguments contained in Plaintiff's complaint and opposition to Kraken's motion to compel arbitration. Further, because courts apply "a standard similar to that applicable for a motion for summary judgment," on a motion to compel, the Court applies its analysis of these arguments above to Plaintiff's motion for judicial determination.  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  Doing so, the Court denies Plaintiff's first five grounds for the same reasons it did above.

As to Plaintiff's sole new argument, the CUTPA cigarette rule argument, the Court rejects this argument as well.  Plaintiff has provided no applicable case law for his argument.  First, *Web Press Servs. Corp. v. New London Motors, Inc.* does not discuss CUPTA in the context of an arbitration agreement.  203 Conn. 342 (1987).  Second, "DOE V. SMITH, No. 3:22-cv-01987 (D. Conn. 2023)," which Plaintiff attributed to the undersigned, is a hallucinated case citation.[6]  Third, *Hottle v. BDO Seidman, LLP*, does not discuss CUTPA at all.  268 Conn. 694 (2004).  Finally, *F.T.C. v. Wyndham Worldwide Corp.* is an out-of-circuit case entitled to nothing more than

---

[6] The Court takes this opportunity to address Plaintiff's inclusion of hallucinated case citations and excessive inclusion of exhibits.  Even though Plaintiff is proceeding *pro se*, Plaintiff still has the responsibility to ensure, to the best of his knowledge, that his pleadings are accurate and that he, or any potential drafting tool he may have used, cites to existing legal authority for his claims.  When Plaintiff includes hallucinated case citations in his briefing, it calls into question the validity not only of his arguments, but also the validity of all materials he submits to the Court, including the exhibits he attaches to his pleadings.  This concern is compounded when Plaintiff insists on including numerous verbose, redundant, and even irrelevant exhibits.  The effect of these superfluous filings, which the Court must review to ensure their accuracy, is a waste of limited judicial resources.

persuasive weight and, in any event, by Plaintiff's own admission, it pertains to the "FTC Act," not CUTPA. 799 F.3d 236 (3d Cir. 2015); ECF No. 23 at 9. Because Plaintiff has provided no authority for his CUTPA argument, and because the Court has no basis to find that submitting this dispute to arbitration would violate CUTPA, the argument fails.

Because Plaintiff has not set forth any meritorious arguments in his motion for "judicial determination," construed as a motion for summary judgment, the Court denies Plaintiff's motion.

## V.     CONCLUSION

For the reasons set forth herein, Kraken's motion to compel arbitration and request to stay these proceedings pending the results of arbitration is GRANTED. Plaintiff's motion for judicial determination is DENIED. The Court orders that Plaintiff and Kraken arbitrate their claims under 9 U.S.C. § 4. These proceedings are hereby STAYED as between those parties under 9 U.S.C. § 3. The parties shall submit a joint status report once arbitration has been scheduled, or in any event no later than October 30, 2026, detailing the progress of the arbitration process.

**SO ORDERED** at Hartford, Connecticut, this 30th day of March, 2026.

.

    /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE

17